# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | |
|---|---|
| AMERICAN HOSPICE, INC. )<br><br>Plaintiff, )<br><br>)<br>v. )<br>)<br>KATHLEEN SEBELIUS,[1] )<br>Secretary of Department of Health )<br>and Human Services, )<br><br>)<br>Defendant. ) | Case Number:<br>1:08-cv-01879-JEO |

## <u>MEMORANDUM OPINION</u>

This is a declaratory judgment action in which the plaintiff, American Hospice, Inc. ("American"), seeks the invalidation of 42 C.F.R. § 418.309(b)(1), a regulation specifying the method to calculate a statutory cap on Medicare payments to hospice providers, on the ground that the regulation allegedly conflicts with the controlling statute, 42 U.S.C. § 1395f(i)(2)(C). The cause comes before the court on cross-motions for summary judgment filed by American (Doc. 16), and by the defendant, the Secretary of the Department of Health and Human Services ("HHS"). (Doc. 17). The parties have submitted evidentiary materials in support of their respective positions and have briefed the motions, which are ripe for decision. Upon consideration, the undersigned finds that both cross-motions are due to be denied.

---

[1] When this action was originally filed on October 9, 2008, the defendant was Michael O. Leavitt, named in his capacity as the Secretary of the Department of Health and Human Services. Kathleen Sebelius has since been sworn into office as the Secretary, and she is thus automatically substituted as the party defendant pursuant to Rule 25(d), FED. R. CIV. P. The clerk is directed to update the court file to reflect such substitution.

I.      BACKGROUND

A.      The Medicare Hospice Benefits Program

Established in 1965 under Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq*., Medicare is a federally funded health insurance program for the elderly and disabled. Subject to a few exceptions, Congress authorized HHS to issue regulations defining reimbursable costs and otherwise giving content to the broad outlines of the Medicare statute.  *See* 42 U.S.C. §§ 1395x(v)(1)(A) and 1395hh(a)(1).  In 1982, Congress expanded the scope of available Medicare benefits to include coverage for hospice care for terminally ill beneficiaries.  *See* Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. 97-248, § 122, 96 Stat. 356, 364.  "The hospice benefit was designed to provide patients who are terminally ill with comfort and pain relief, as well as emotional and spiritual support, generally in a home setting."  *National Hospice and Palliative Care Organization, Inc. v. Weems*, 587 F. Supp. 2d 184, 187 (D.D.C. 2008) (citing Final Rule Providing Medicare Hospice Coverage, 48 Fed.Reg. 56,008 (Dec. 16, 1983)). Medicare hospice services are generally provided at the patient's home and may include nursing care, physical or occupational therapy, speech-language pathology services, medical social services, counseling, home health aide services, physicians' services, and short-term inpatient care, as well as drugs and medical supplies.  42 U.S.C. § 1395x(dd)(1).  By electing to receive hospice benefits, a patient waives all rights to Medicare payments for treatment of the underlying terminal illness and related conditions by someone other than the individual's attending physician or the chosen hospice provider.  42 U.S.C. § 1395d(d)(2)(A).

Under the hospice benefit, Medicare reimburses a hospice provider a predetermined fee for each day that an eligible patient receives hospice care in the provider's program, regardless of

what particular services the provider may have furnished on that day.  42 U.S.C. § 1395f(i); 42

C.F.R. § 418.302.  To be eligible for hospice benefits, a physician must certify that the patient is

"terminally ill," 42 U.S.C. § 1395f(a)(7), which is statutorily defined as "a medical prognosis that

the individual's life expectancy is 6 months or less." 42 U.S.C. § 1395x(dd)(3)(A).  A

beneficiary may elect the hospice benefit for specific lengths of time referred to as benefit

periods.  The program provides for two initial 90-day benefit periods followed by an unlimited

number of 60-day benefit periods.  42 U.S.C. § 1395d(a)(4); *see also Barys ex rel. United States

v. Vitas Healthcare Corp.*, 298 Fed. Appx. 893, 894 (11th Cir. Nov. 3, 2008) (unpublished).  At

the end of each period, the patient can be re-certified if at that time they are still deemed to have

less than six-months to live if the illness runs its normal course.  42 U.S.C. § 1395f(a)(7).

###### B.      The Cap on Payments to Hospice Providers

While the Medicare statute allows each individual *patient* to receive hospice benefits for

a theoretically unlimited period of time, the statute establishes an cap on total reimbursement

payments from Medicare that each hospice *provider* may receive for all of its patients in a fiscal

year.  The relevant statute, 42 U.S.C. § 1395f(i), provides in pertinent part as follows:

> (2)(A) The amount of payment made under this part for hospice care provided by
> (or under arrangements made by) a hospice program for an accounting year may
> not exceed the "cap amount" for the year (computed under subparagraph (B))
> multiplied by the number of medicare beneficiaries in the hospice program in that
> year (determined under subparagraph (C)).

> * * *

> (C) For purposes of subparagraph (A), the "number of medicare beneficiaries" in
> a hospice program in an accounting year is equal to the number of individuals
> who have made an election under subsection (d) of this section with respect to the
> hospice program and have been provided hospice care by (or under arrangements
> made by) the hospice program under this part in the accounting year, *such number*

> *reduced to reflect the proportion of hospice care that each such individual was*
> *provided in a previous or subsequent accounting year* or under a plan of care
> established by another hospice program.

42 U.S.C.A. § 1395f(i)(2) (emphasis added).

American's claim in this action revolves around how, in determining its aggregate cap for the fiscal year 2006, running from November 1, 2005 to October 31, 2006 ("FY06"), the number of American's beneficiaries was to be "reduced to reflect the proportion of hospice care that each such individual was provided in a previous or subsequent accounting year," as provided in 42 U.S.C. § 1395f(i)(2)(C).[2]  In particular, American disputes the validity of a portion of the regulation promulgated by HHS that purports to implement the statute was used to calculate American's aggregate cap.  That regulation, set forth at 42 C.F.R. § 418.309, provides in pertinent part as follows:

> The hospice cap amount is calculated using the following procedures:
>
> * * *
>
> (b) Each hospice's cap amount is calculated ... by multiplying the adjusted cap amount determined in paragraph (a) of this section by the number of Medicare beneficiaries who elected to receive hospice care from that hospice during the cap period.  For purposes of this calculation, the number of Medicare beneficiaries includes-
>
> > (1) Those Medicare beneficiaries who have not previously been included in the calculation of any hospice cap and who have filed an election to receive hospice care, in accordance with § 418.24, from the hospice during the period beginning on September 28 (35 days before the beginning of the cap period) and ending on September 27 (35 days before the end of the cap

---

[2]No issue is made here regarding the per beneficiary cap amount used to calculate American's aggregate cap amount. The Medicare statute originally provided in 1982 that the per beneficiary cap amount was $6,500 per year, with adjustments to be made thereafter based upon changes in the Consumer Price Index.  42 U.S.C.A. § 1395f(i)(2)(B).  It is undisputed that such amount had increased to $20,585.39 for FY06.  (Compl. ¶ 24; Memorandum in Support of Defendant's Motion for Summary Disposition ("Dft. Mem."), Doc. 18, at 13 n.1; Record of Administrative Proceedings Before the Medicare Provider Reimbursement Review Board ("Admin. Rec."), Doc. 10, at 8, 11).  American has also not raised challenged cap allocations related to any of its patients that might have received care in another eligible hospice program.

4

period).

42 C.F.R. § 418.309(b)(1); *see also* Medicare Program; Hospice Care, 48 Fed. Reg. 38,146-01

(August 22, 1983).  As one court has summarized, the regulation thus

> establishes a rather simple method for determining the number of beneficiaries in
> a particular year by using September 28 as the cutoff date for a particular fiscal
> year.  Under this method, a patient who first sought hospice care on September 27,
> 2005 would be counted in the 2005 fiscal year for determining the "number of
> beneficiaries" in that year, while a patient who first sought hospice care on
> September 30, 2005 would be counted in the 2006 fiscal year....

*Heart to Heart Hospice, Inc. v. Leavitt* [No. 1:07-CV-289-M-D], 2009 WL 279099, *2 (N.D.

Miss. Feb. 5, 2009) (unpublished).

American's claim in this action is that 42 U.S.C. § 418.309(b)(1) conflicts with 42 U.S.C.

§ 1395f(i)(2)(C).  Specifically, American asserts that, where a patient has received hospice care

in more than one fiscal year, the statute mandates that such patient's cap allocation is to be

*divided* between fiscal years *in proportion* to the number of days care was actually received in

each fiscal year.  By contrast, American emphasizes, the regulation always allocates each

patient's *entire* cap allocation only to a *single* fiscal year, either the year of admission or the

"next" year, based solely upon the date that the patient first entered the program and not in

proportion to care actually received in each year.

## C.    The Demand on American to Repay Amounts Exceeding Its Cap

American is a Medicare-certified hospice provider located in Sylacauga, Alabama.

(Affidavit of Leon Washburn ("Washburn Aff.")[3] ¶ 3).  Since becoming licensed in 2003,

American has provided hospice care to approximately 358 patients.  (*Id*.)  Providers like

---

[3]Leon Washburn's Affidavit is Doc. 16-8, Exhibit 7 to Plaintiff's Evidentiary Submission, Doc. 16.

American are reimbursed by Medicare via "fiscal intermediaries," public or private entities
(usually insurance companies under contract with the government) that make initial
determinations as to the appropriate reimbursement amounts, process payments, and conduct
year-end reconciliation.  *See* 42 U.S.C. §§ 1395h, 1395kk-1; 42 C.F.R. §§ 405.1801; 405.1803.
Pursuant to 42 C.F.R. §§ 418.308(c) and (d) and 405.1803(a)(3), American's intermediary gave
written notice in early 2008 that it had determined that reimbursements to American for FY06
exceeded American's aggregate cap amount by $392,121.[4]   (Record of Administrative
Proceedings Before the Medicare Provider Reimbursement Review Board (hereinafter "Admin.
Rec.")[5] at 8).   The intermediary thus demanded that American refund that sum to Medicare.  *Id.*

American appealed the intermediary's cap determination and refund demand to
Medicare's Provider Reimbursement Review Board ("PRRB"), pursuant to 42 U.S.C. § 1395oo
and 42 C.F.R. § 418.311.  (Admin. Rec. at 5-6).  Before the PRRB, American challenged the
assessment on the basis that the cap regulation, 42 C.F.R. § 418.309(b)(1), was invalid as
conflicting with 42 U.S.C. § 1395f(i)(2), specifically with respect to the regulation's calculation
of "the number of Medicare beneficiaries" and its failure to allocate cap allowance across
accounting years.  (Admin. Rec. at 5).  While the PRRB found that it had jurisdiction over
American's administrative appeal and that American would be entitled to a hearing, it concluded
that the only disputed material issue before it was a purely legal one: the validity of the cap

---

[4]The intermediary's cap and refund calculations for American for FY06 were as follows: It credited American with
40.7228 beneficiaries electing hospice care.  (*See* Admin. Rec. at 11).  At a per-patient cap amount of $20,585.39, American's
cap was determined to be $838,294.72.  (*Id.*) The intermediary determined that American had been reimbursed $1,230,415.49 in
actual payments, or $392,120.77 over the cap (*id.*), which was evidently rounded up to the next whole dollar.

[5]The Record of Administrative Proceedings Before the Medicare Provider Reimbursement Review Board is Doc. 10.
A copy of the fiscal intermediary's demand letter to American is also included as Exhibit D to the HHS's Summary Judgment
Evidentiary Submission, Doc. 19, at 60-142.

regulation.  (Admin. Rec. at 2).  Because the PRRB concluded that it was bound by the

regulation and lacked authority to invalidate it, *see* 42 C.F.R. § 405.1867, the PRRB granted

American's request for expedited judicial review, *see* 42 U.S.C. § 1395oo(f)(1) and 42 C.F.R. §

405.1842, of the validity of the regulation and the intermediary's cap liability assessment using it

for the subject year.  (Admin. Rec. at 1-2).

On October 9, 2008, American filed its complaint in this court asserting that 42 C.F.R. §

418.309(b)(1) is invalid as being arbitrary, capricious, and contrary to the plain language of 42

U.S.C. § 1395f(i)(2)(C).  (Complaint ("Compl.")[6] ¶ 9).  American alleges that during FY06

American provided hospice services for "many" patients first admitted in fiscal year 2005

("FY05"), running from November 1, 2004 to October 31, 2005, and whose cap allocations were

assigned entirely to FY05, as directed by the regulation.  (Washburn Aff. ¶ 5).  Medicare paid

American for these services as rendered in FY05 and FY06, but American alleges that because

the regulation specifies the entire cap allocation for those patients to FY05, American received

"improper and insufficient cap allocations for these patients in [FY06]."  (Washburn Aff. ¶ 5).  In

its complaint, American contends that the "zero" cap allocation "in [FY06] for patients served in

[FY06] created an artificially low aggregate cap for [FY06]."  (Compl. ¶ 36)  Thus, American

alleges in its pleading that "[i]f Medicare had followed the mandate [in 42 U.S.C. §

1395f(i)(2)(C)] to allocate cap room across years of service, ... on information and belief,

[American's] cap liability for [FY06] would have been materially reduced or even eliminated

entirely."  (*Id*. ¶ 36).

In terms of relief, American seeks a declaration from this court holding invalid both the

_____

[6]The Complaint is Doc. 1.

regulation and Medicare's demand for a refund for FY06 based on the regulation.  (Compl. § VII ¶¶ 1, 2).  American also requests an order requiring Medicare to return to American, with interest, all monies American has overpaid towards repayment of Medicare's demand for FY06.  (*Id*. § VII ¶ 3).  American further demands an order "vacating" the regulation and enjoining HHS from using it to calculate the aggregate cap of American or any other hospice.  (*Id*. § VII ¶ 5).  Finally, American seeks an award of attorney's fees and costs.  (*Id*. § VII ¶ 6).

## II.     STANDARDS OF REVIEW

### A.     Judicial Review Under § 1395oo(f)(1) and the APA

The court has jurisdiction pursuant to 42 U.S.C. § 1395oo, which in relevant part grants Medicare providers "the right to obtain judicial review of any action of the fiscal intermediary which involves a question of law or regulations relevant to the matters in controversy whenever the [PRRB] determines ... that it is without authority to decide the question ... ."  42 U.S.C. § 1395oo(f)(1); *see also Bethesda Hosp. Ass'n v. Bowen*, 485 U.S. 399, 406-07 (1988); *Tallahassee Memorial Reg. Med. Ctr. v. Bowen*, 815 F.2d 1435, 1460-61 (11th Cir. 1987). Section 1395oo(f)(1) provides that civil actions arising thereunder are governed by "the applicable provisions under chapter 7 of Title 5," which codify the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701-706.  The Eleventh Circuit has explained:

> Under that standard of review, considerable weight should be given to an agency's regulations interpreting matters over which the agency is charged to administer. *See Medical Center Hospital v. Bowen*, 839 F.2d 1504, 1510 (11th Cir.1988) (citations omitted); *Chevron U.S.A. v. Natural Resources Defense Council, Inc., et al.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), reh'g denied, 468 U.S. 1227, 105 S.Ct. 28, 29, 82 L.Ed.2d 921 (1984).  "Neither a district court nor an appellate court may overturn the Secretary's decision unless it

8

is arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence in the record taken as a whole." *Carraway Methodist Medical Center v. Heckler*, 753 F.2d 1006, 1009 (11th Cir.1985) (citations omitted).

Although deference should be afforded especially "when, as here [in Medicare], the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns,' " *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, ----, 115 S.Ct. 1232, 1243, 131 L.Ed.2d 106 (1995) (O'Connor, J., dissenting) (quoting *Thomas Jefferson University v. Shalala*, 512 U.S. 504, ----, 114 S.Ct. 2381, 2387, 129 L.Ed.2d 405 (1994) (citation omitted)), courts are not bound by an agency's interpretation. Furthermore, a court must not abdicate its responsibility to review "an agency's construction that is alleged to be inconsistent with the statutory mandate." *Medical Center Hospital*, 839 F.2d at 1510.

*Sarasota Memorial Hosp. v. Shalala*, 60 F.3d 1507, 1511 (11th Cir. 1995).

## B.    Summary Judgment Standards

Summary judgment is to be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in the State of Alabama*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) ("*Four Parcels*") (quoting *Anderson*, 477 U.S. at 248, 251-52).

The party moving for summary judgment

bears the initial burden to show the district court, by reference to materials on file,

that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment.

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  For issues on which the movant would bear the burden of proof at trial,

that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial.  In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party.

*Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (quoting *Four Parcels*, 941 F.2d at 1438 (citations and internal quotation marks omitted; emphasis in original).  On the other hand, where the non-movant will bear the burden of proof on a claim or issue at trial, the movant can satisfy this initial burden of production at summary judgment by pointing to specific portions of the record materials on file that either negate an essential element of the non-movant's claim or that show "that the party bearing the burden of proof at trial will not be able to meet that burden."  *Clark*, 929 F.2d at 608; *see also Four Parcels*, 941 F.2d at 1438 & n.19.

Once the moving party has met its burden, Rule 56(e), FED. R. CIV. P.,  "requires the nonmoving party to go beyond the pleadings and by affidavits, or by the 'depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.' " *Celotex*, 477 U.S. at 324.  The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings.  *Id.*  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the

matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Accordingly, in its review of the evidence, a court must credit the evidence of the non-movant and draw all justifiable inferences in the non-movant's favor. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000). But, if after sufficient time for discovery, the nonmoving party's evidence fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof [at trial]," *Celotex*, 477 U.S. at 323, the moving party is entitled to summary judgment.

The fact that each party has filed a motion for summary judgment does not alter the Rule 56 burdens and standards applicable to each one. "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (citation omitted); *see also Busby v. JRHBW Realty, Inc. d/b/a RealtySouth*, 642 F. Supp. 2d 1283, 1289 (N.D. Ala. 2009) ("The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit," citing Wright, Miller & Kane, *Federal Practice and Procedure* § 2720, at 327-28 (3d ed. 1998)). "When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." *Muzzy Products, Corp. v. Sullivan Indus., Inc.*, 194 F. Supp. 2d 1360, 1378 (N.D. Ga. 2002) (quoting *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1338-39 (Fed. Cir. 2001)).

## III.   DISCUSSION

### A.   Article III Standing

HHS first argues that this action is due to be dismissed on the theory that American lacks Article III standing.  "In limiting the judicial power to 'Cases' and 'Controversies,' Article III of the Constitution restricts it to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law.  *Summers v. Earth Island Institute*, ___ U.S. ___, ___, 129 S.Ct. 1142, 1148 (2009).  "Except when necessary in the execution of that function, courts have no charter to review and revise legislative and executive action."  *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-560 (1992); *Los Angeles v. Lyons*, 461 U.S. 95, 111-112 (1983)).

> Standing under Article III has three elements: (1) "the plaintiff must have suffered an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;" (2) "there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court;" and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Florida Family Policy Council v. Freeman*, 561 F.3d 1246, 1253 (11th Cir. 2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (alterations, citations, and quotation marks omitted).  The Supreme Court has further explained:

> The party invoking federal jurisdiction bears the burden of establishing these elements.  Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.  At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice ... .  In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true.  And at the final stage, those facts (if controverted) must be "supported adequately by the evidence adduced at trial."

*Lujan*, 504 U.S. at 561 (citations omitted).

HHS argues primarily that American's allegations of injury in the complaint are insufficient and that American further has failed to establish that a cap calculation employing individualized beneficiary assessments across accounting years, as American urges is required under 42 U.S.C. § 1395f(i)(2)(C), would actually result in any higher aggregate cap amount for American for FY06 than the cap amount as determined pursuant to 42 C.F.R. § 418.309(b)(1). As such, HHS contends, American has no redressable injury caused by the regulation because American fails to show that it has been required to refund any greater sum under the regulation than it would have based upon a cap calculation under the statute.

In response, American does not state that it has evidence showing *directly* that its aggregate cap amount for FY06 was actually any higher under the regulation that it would have been under the statute.  Indeed, while American's cap amount for FY06 under the regulation is in the record, neither party has offered any evidence purporting to show what American's aggregate cap for FY06 would have been using the statutorily calculation, *i.e.*, allocating cap room for each individual patient across fiscal years based upon the proportion of care furnished in each year. Accordingly, there can be no simple comparison between the alternative cap calculations. Rather, American makes two arguments.  American says on the one hand that it has pled, and that it can further be reasonably *inferred* circumstantially from the record evidence, that there is at least a "likelihood" that American suffered a financial injury caused by the regulation versus the statutory calculation, which, American asserts, is all that is required under Article III.. American alternatively maintains, however, that, in order to establish standing, it is unnecessary to determine what its aggregate cap for FY06 might have been under some "other" calculation,

including one under the statute, because the regulation was undisputedly applied to American in

calculating its cap liability.  The court addresses these arguments in turn.

### 1.      Standing Based on a Lower Cap Amount under the Statute than Under the Regulation

#### a.      Standing at the Pleading Stage

Much of HHS's standing challenge is actually directed to the ostensible failure of

American's *complaint* to sufficiently *allege* an Article III injury caused by the regulation.  "'At

the pleading stage, general factual allegations of injury resulting from the defendant's conduct

may suffice [to establish standing] ... .'" *Bennett v. Spear*, 520 U.S. 154, 168 (1997) (quoting

*Lujan*, 504 U.S. at 561); *see also Made in the USA Found. v. United States*, 242 F.3d 1300, 1306

n.13 (11th Cir. 2001).  Federal pleading rules require only a "short and plain statement of the

claim showing that the pleader is entitled to relief," as well as "a demand for the relief sought."

Rules 8(a)(2) & (a)(3), FED. R. CIV. P.  Thus, the standard under which American's complaint is

to be judged is liberal and does not generally oblige American to identify or demand any

particular sum with regard to its injury.  Rather, allegations of injury in a complaint will deemed

sufficient so long as they are generally able "to provide a defendant with some indication of the

loss and the causal connection [to the defendant's conduct] that the plaintiff has in mind."  *Dura*

*Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

American has alleged that Medicare, via the fiscal intermediary, has demanded that

American repay $392,121 in benefits reimbursements it had received for FY06 on the ground

that American had exceeded its aggregate cap for that fiscal year by that sum.  (Compl. ¶ 36).

American has further alleged that it provided care in FY06 to patients admitted in FY05 but

whose total cap allocations were assigned to its cap for FY05 under the regulation (*id*. ¶ 35), and that "[i]f Medicare had followed the Congressional mandate [set forth in the statute] to allocate cap room across years of service, ... on information and belief[7] that [American's] cap liability for [FY] 2006 would have been materially reduced or even eliminated entirely." (*Id.* (footnote added)).  HHS takes issue with those allegations, characterizing them as "vague, conjectural, and speculative at best." (Memorandum in Support of Defendant's Motion for Summary Disposition ("Dft. Mem.")[8] at 24).

The court concludes that American's complaint is sufficient to establish standing at the pleading stage.  In *Compassionate Care Hospice, L.L.C. v. Sebelius* [No. 5:09-cv-28-C], 2009 WL 2163503, *2-3 (W.D. Okla. July 10, 2009), the court held that materially indistinguishable allegations, contained in a complaint filed by the same counsel that represents American in the instant action, were sufficient to confer standing at the pleading stage.  *See also id.*, Complaint, Doc. 1, ¶¶ 34-38 (W.D. Okla. Jan. 12, 2009).  This court agrees.  American's allegations give fair notice that American is claiming that it suffered a direct economic injury as a result of the application of the regulation relative to what it would have had to repay had Medicare applied the statutory calculation to determine American's aggregate cap for FY06.  Such an injury would be

_____

[7]HHS contends that the complaint's allegations of injury cannot confer standing because they are made "on information and belief."  (Defendant's Response in Opposition to Plaintiff's Motion for Summary Judgment and Brief in Support ("Dft. Opp."), Doc. 20, at 8-9).  The court disagrees.  Pleadings made on "'information and belief' are generally deemed permissible under the Federal Rules, especially in cases in which the information is more accessible to the defendant."  *Johnson v. Johnson*, 385 F.3d 503, 531 (5th Cir. 2004) (citing 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1224 (2d ed. 1990)).  The fact that a statement is made on "information and belief" means only that the declarant lacks personal knowledge of the truth of the statement.  There is nothing in federal pleading rules, however, that requires a complaint to be made on personal knowledge.  In fact, the rules expressly contemplate that a plaintiff need not be aware of any proof supporting factual allegations of a complaint at the time of filing provided that the plaintiff or its counsel has a reasonable, good faith basis to believe that such allegations "will likely have evidentiary support after a reasonable opportunity for further discovery," Rule 11(b)(3), FED. R. CIV. P.  *See Langadinos v. American Airlines, Inc.*, 199 F.3d 68, 73 & n.9 (1st Cir. 2000).

[8]The Defendant's Memorandum in Support of Summary Disposition is Doc. 18.

tangibly redressed by a judgment invalidating the regulation and requiring HHS to redetermine American's cap amount using the statutory allocation method, which would, in turn, reduce or eliminate American's cap liability.  *Compassionate Care, supra*; *cf. Franchise Tax Bd. of Calif. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990) (holding that if California's accounting method used to determine the amount of the taxes assessed against the defendant's subsidiaries results in "taxes that are higher than the law of the land allows, that method threatens to cause actual financial injury" to the defendants); *National Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 256 (1994) (allegations that defendants conspired to use force to induce abortion clinic staff to stop working and patients to seek medical services elsewhere, thereby injuring the business and property interests of plaintiff abortion providers, were sufficient to confer standing at pleading stage).

###### b.      Standing at Summary Judgment

###### i.      HHS's Motion

While a plaintiff can rely on the allegations of its complaint to establish standing initially, it cannot do so in response to a defendant's properly supported motion for summary judgment. *See Lujan*, 504 U.S. at 561; *United States v. SCRAP*, 412 U.S. 669, 689-90 (1973); *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 975-76 (11th Cir. 2005); *Bischoff v. Osceola County, Fla.*, 222 F.3d 874, 878 (11th Cir. 2000).  HHS thus argues, citing, *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103-04 (1998), that the burden is now on American to come forward with *evidence* containing *specific facts* supporting its allegations of standing.  (*See* Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment and Memorandum

16

in Support ("Dfts. Reply")[9] at 4).   The court disagrees.

*Steel Co.* was decided at the Rule 12(b) motion-to-dismiss stage, *see* 523 U.S. at 104, and the undersigned has already determined that American has met its burden to plead the elements of Article III standing.   To the extent that *HHS* now moves for *summary judgment* based on a lack of standing, American would have a burden under Rule 56(e)(2) to produce admissible evidence demonstrating an issue of fact on the issue of standing only if HHS has first satisfied its initial burden as the movant under Rule 56(c) to demonstrate that there is an absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law.   *See SCRAP*, 412 U.S. at 689 (recognizing that a defendant may challenge a plaintiff's allegations in support of standing by moving for summary judgment and "demonstrat[ing] to the District Court that the allegations were a sham and raised no genuine issue of fact."); *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 65-66 (1987) (holding that a plaintiff is not constitutionally required to make a threshold evidentiary showing in support of the complaint's allegations of injury to invoke federal court jurisdiction); *see also Bochese*, 405 F.3d at 975; *Florida Audubon Soc. v. Bentsen*, 94 F.3d 658, 676 (D.C. Cir. 1996).   HHS could meet that burden relative to its standing argument in one of two ways: (1) by filing or otherwise pointing to evidence in the record *negating* the complaint's allegation that American's aggregate cap amount for FY06 was lower under the regulation than it would have been using an allocation method based on the statute or (2) by demonstrating that there is an "absence of evidence" to establish that proposition.   *See Clark*, 929 F.2d at 608; *Four Parcels*, 941 F.2d at 1438 & n.19.

HHS has not attempted to demonstrate directly that American's aggregate cap amount for

---

[9]The Defendant's Reply is Doc. 22.

17

FY06 actually would have been no lower under the statutory method of calculation.  Again, neither party has pointed to evidence showing what that American's aggregate cap number or liability would be under the statute.  HHS does seem to suggest, however, that the evidence does indicate that American exceeded its aggregate cap amount for FY06 not because of the regulation's method of cap allocation but rather because American's average length of stay significantly exceeds the national average.  (*See* Dft. Opp. at 10 n.4).  In support, HHS points to the affidavit of Leon Washburn, American's Vice President and Assistant Administrator, reciting that American's average length of stay is "at least 111 days" (Washburn Aff. ¶¶ 2, 4), which HHS compares that to the 72-day national average in 2006, as found in a report by the Centers for Medicaid & Medicaid Services.  (Dft. Opp. at 10 n.4).  "*This* [discrepancy]," HHS asserts, "likely accounts for [American's] Medicare cap overpayment."  (*Id*. (emphasis original)).

To the extent that such argument amounts to a claim that the evidence shows that American suffered no injury because of the regulation, it is misdirected.  In effect, such is an assertion that American's cap liability exists not because its cap number was "too low" as calculated under the regulation, but rather, because American's billing to Medicare was "too high," in that its patients remained in its program for "too long."  As explained previously, however, the Medicare statute does not limit the number of days that an individual qualifying patient may receive hospice benefits.  Nor is there a limitation on a hospice provider's average length of patient stay.  More to the point, the total amount that Medicare initially reimburses to a provider *is* whatever it *is* and has no relation to the provider's aggregate cap number.  That is, the total reimbursement is a fixed sum representing the provider's billing for eligible services it has furnished.  For FY06, American's total billing reimbursed by Medicare was $1,230,415.49

18

(Admin. Rec. at 11), utterly irrespective of what its American's cap number was.  The cap is significant only at the "other end" of the liability calculation because it establishes the limit upon how much of its total reimbursed billing a provider may *keep*.  All other things being equal, a provider's total reimbursements will be higher the longer that each patient stays in the program, and the more that the provider bills per patient, the greater the chance that the provider will exceed its cap.  Of course, that is true *regardless* of what the provider's cap number is or how it is calculated.  Under the regulation's method of cap allocation, American's aggregate cap for FY06 was $838,294.72.  (*Id.*)  No matter how long American's average length of stay and no matter how high its per-patient reimbursement or its total reimbursement, if American's aggregate cap number would be higher using the statutory calculation, then the difference between American's total reimbursement and its aggregate cap is necessarily reduced.  The regulation would have thus caused American to suffer a discrete financial injury sufficient to confer standing.  Accordingly, HHS's argument regarding American's average length of stay entirely fails to negate the complaint's allegation that the regulation caused American to suffer economic injury relative to a statutory calculation.

HHS's primary argument in support of summary judgment, however, is based upon an alleged lack of evidence showing that American was injured by the regulation.  Specifically, HHS asserts in its brief that American "has failed to establish that it has standing to bring this lawsuit" and that it "has not shown that it suffered an injury caused by the regulation."  (Dfts. Mem. at 20-21).  However, in order to shift the burden of production under Rule 56(c), FED. R. CIV. P., based upon an alleged lack of evidence, HHS "must point to specific portions of the record in order to demonstrate that [American] cannot meet its burden of proof at trial."  *Four*

19

*Parcels*, 941 F.2d at 1438 n.19 (citing *Celotex*, 477 U.S. at 325)).  HHS's bald assertion in its

brief fails to do that.  "[I]t is never enough" for a movant for summary judgment to meet its

initial burden "simply to state that the non-moving party cannot meet its burden at trial," *Clark*,

929 F.3d at 608, or to make "a conclusory assertion that the plaintiff has no evidence to prove his

case." *Four Parcels*, 941 F.2d at 1438 n.19 (quoting *Celotex*, 477 U.S. at 328 (White, J.,

concurring)).  This is because a movant generally does not satisfy its initial burden simply by

pointing out to the court that the materials produced in formal discovery or the materials in the

court file, as they might be constituted following the filing of the defendant's motion, *do not*

*include* evidence of every essential element of a plaintiff's claim.  While a plaintiff has the

burden to prove its claim *at trial*, Rule 56 does not imply that a plaintiff has a freestanding

obligation to reduce to a tangible form and disclose evidence relative to every element of its case

*prior* to trial, to "prove its case in discovery," so to speak.  Justice White, whose vote was

required to create a majority in *Celotex* itself, explicitly recognized this, stating:

> [a] plaintiff need not initiate any discovery or reveal his witnesses or evidence
> unless required to do so under the discovery Rules or by court order.  Of course,
> he must respond if required to do so; but he need not also depose his witnesses or
> obtain their affidavits to defeat a summary judgment motion asserting only that he
> has failed to produce any support for his case.

*Celotex*, 477 U.S. at 328 (White, J., concurring).  Instead, "[w]hen moving for summary

judgment, a party asserting the absence of evidence to support the nonmoving party's case should

be required to show that reasonable efforts have been made to uncover the relevant evidence,

through use of interrogatories, document requests, depositions, and requests for admission."

Melissa L. Nelkin, *One Step Forward, Two Steps Back: Summary Judgment After Celotex*, 40

Hastings L.J. 53, 68-69 (1988) (cited in *Fitzpatrick*, 2 F.3d at 1116 n.2)); *see also Clark*, 929

F.2d at 607-08 (discussing how the defendant in *Celotex* had met the movant's burden using the "absence of evidence" method by reference to interrogatory responses in which the plaintiff indicated it had no witnesses to testify to the decedent's exposure to the defendant's asbestos products, an essential element of the plaintiff's claim).  Because HHS has not carried its burden to demonstrate that American will be unable to meet its burden at trial to prove standing, no burden shifted to American under Rule 56(e) to offer evidence supporting the allegations in its complaint on the issue.  Accordingly, HHS's motion for summary disposition is due to be denied insofar as it is based upon American's alleged lack of standing.

## ii.    American's Motion

Despite the failure of HHS's dispositive motion on the issue, the court ultimately must still evaluate whether the record evidence as it now stands establishes American's Article III standing.  This is because American also has itself moved for summary judgment in its favor.  As the plaintiff, American would bear the burden of proof at trial to establish standing, *see Lujan*, 504 U.S. at 561, so American likewise bears the burden as the movant for summary judgment to present evidence demonstrating that it has standing.  *See Fitzpatrick,* 2 F.3d at 1115; *see also e.g.*, *Department of Commerce v. United States House of Representatives*, 525 U.S. 316, 329-30 (1999).

American first attempts to establish standing on the theory that evidence shows that there is at least a "*likelihood*" that it suffered a financial injury from the application of 42 C.F.R. § 418.309(b)(1) relative to a calculation under the controlling statute, 42 U.S.C. § 1395f(i)(2)(C).  (Plaintiff's Surreply in Support of Motion for Summary Judgment and in Opposition to

Defendant's Motion for Summary Judgment ("Pl. Surreply")[10], at 1 (emphasis original).  In

support, American relies upon Washburn's testimony that, for the approximately 358 patients

American has served since it became a licensed hospice provider in 2003, "the average length of

stay for each of American's patients has been at least 111 days."  (Washburn Aff.  ¶¶ 3, 4).

American emphasizes that the regulation creates a scheme whereby the entirety of a patient's cap

allocation is assigned to either the fiscal year of admission or the subsequent fiscal year based

upon an assumed average stay of only 70 days.  Because of this, American contends,

> [b]y definition, cap allocation will be mismatched to revenue for any hospice with
> an average length of stay other than 70 days.  If a hospice, like American, has a
> longer than average length of stay, then under HHS' own assumptions, too little
> cap room will be pushed into the next year.  In short, cap allowances that are need
> to protect revenue in subsequent years will be trapped in prior years.

Pl. Resp. at 3.  American also points to Washburn's testimony that "[f]or [FY06], American

served many patients first admitted in [FY05]" and that Medicare reimbursed "American for

these services as rendered in [FY05] and [FY06]."  (Washburn Aff. ¶ 5).  Washburn further

relates that "American received improper and insufficient cap allocations for these patients in

[FY] 2006" because the regulation assigned all of their cap allocations to FY05 based upon their

respective dates of admission to the program in FY05.  (*Id*. ¶ 5).

American's analysis and Washburn's testimony do not reasonably indicate that American

was even "likely" or "probably" injured by a lower cap calculation for FY06 under the regulation

than it would have had under the statute, never mind that American was certainly injured.  As

American recognizes, the regulation does identify patients by date of admission that are likely,

based upon an assumed average length of stay of 70 days, to receive hospice care in both the

---

[10]The Plaintiff's Surreply is Doc. 24.

accounting year of admission and in the next accounting year, effectively establishing a "cap year" running from September 28 and September 27 that is shifted to begin 35 days (representing one half of the assumed average stay) ahead of the fiscal year.  It then assigns all of the cap room for each patient admitted during that "cap year" to the corresponding *fiscal* year, in which the regulation assumes the patient will likely, again, based on an assumed average stay of 70 days, to receive the majority of his or her hospice care.[11]  The regulation thereby purports to "produce a reasonable estimate of the proportionte number of beneficiaries to be counted in each cap period," 48 Fed. Reg. at 38,158, by attempting to capture one-half of the aggregate cap room for all of these patients to the fiscal year of admission and the other half to the subsequent fiscal year, based upon an expectancy that cap allocations "taken away" from patients likely to receive a minority of their care in the fiscal year of admission will, on average, be counterbalanced evenly with the excess cap room allocated to other patients likely to receive a majority of their care in that same year.  As American suggests, for programs that have a higher or lower average length of stay, the regulation's use of an assumed average stay of 70 days will create a tendency to allocate cap room disproportionately relative to actual care provided to either the fiscal year of admission or to the "next" fiscal year.  For American, because of its longer average stay, cap allocations would tend to be greater in the fiscal year of admission at the expense of the "next" fiscal year because the 35-day shift is not adequate to evenly capture and allocate the cap room for all of American's patients that are likely, based on *American's* average, to receive care in two fiscal years.  However, American's argument fails because it at once proves both too much and

---

[11]For example, all cap allocations for all patients first admitted during the "cap year" 2006 running from September 28, 2005 to September 27, 2006 would be assigned to the *fiscal year* 2006 running from November 1, 2005 to October 31, 2006. *See* 42 C.F.R. § 418.309(b)(1).

23

too little.

American's argument proves too much because, under either a statutory or regulatory calculation, each patient admitted to a provider's program (assuming, as the court does here throughout this report and recommendation, that the patient has not received care in another Medicare hospice program) carry with them one full year's worth of cap "room" to be allocated to the provider, irrespective of the amount of time that the patient ultimately spends in the provider's program, whether one day, one year, or more.  Thus, although a patient's one-year cap allocation may be assigned entirely to a single fiscal year under the regulation or divided between the two fiscal years in which hospice care was actually received, as contemplated by the statute,[12] the allocation of cap room is essentially a zero-sum calculation.[13]  That is, if a patient's percentage cap allocation to one particular fiscal year under the regulation is disproportionately *low* relative to the percentage of care actually received in that year versus the preceding or subsequent fiscal year, there will necessarily be an equally disproportionately *high* percentage cap allocation to either the preceding or subsequent accounting year for that same patient.  So the

---

[12]The Medicare statute speaks to a "proportion[al]" reduction of the number of a provider's beneficiaries to reflect the amount of hospice care that each individual patient was provided in the accounting year at issue as well as "in a previous or subsequent accounting year." 42 U.S.C. § 1395f(i)(2)(C). This would seem to suggest a contemplation that a patient would receive hospice benefits in at most only two different fiscal years.  Indeed, the Medicare initially limited an individual patient to receipt of hospice benefits for a total of 210 days.  *See* 42 U.S.C. § 1395d (1990).  That restriction was removed in 1998, however, so an individual patient now can receive, notwithstanding the aggregate cap applicable to providers, hospice benefits for a theoretically unlimited number of days, provided that they are properly re-certified at the end of each benefit period as still likely having less than six months to live. 42 U.S.C. § 1395d(d)(1).  Accordingly, it is possible that American's patients could have received hospice benefits for care provided in even more than two different fiscal years.  However, such a hospice stay would necessarily span at least 367 days, far longer than either American's 111-day average length of stay or even the expected six-month lifespan required for eligibility certification.  Moreover, there has been no suggestion that any of American's patients at issue in this case actually did receive hospice care in more than two fiscal years.  For these reasons, and for the sake of simplifying an already complex discussion, the court's analysis in the text assumes that American's relevant patients might have received hospice benefits in no more than two different fiscal years, spanning FY05, FY06, and FY07, inclusive.

[13]The assignment of cap amounts is not entirely a zero-sum exercise insofar as the cap amount for each individual patient tends to increase over time because it is subject to an annual adjustment pegged to changes in the Consumer Price Index. 42 U.S.C.A. § 1395f(i)(2)(B).  Accordingly, the percentage of a patient's cap allocated to an earlier fiscal year might be fractionally smaller dollar sum than if that same percentage of the cap were allocated to a later fiscal year.

24

only salient issues here are (1) in what fiscal year or years an individual patient's cap room is allocated and, more importantly for our purposes, (2) whether the provider's *aggregate* of the cap amounts for *all* patients in its program for the specific fiscal year in which a refund has been demanded is higher or lower versus what it would have been under the statute.

Assuming that American's average length of stay remains constant from one fiscal year to the next, and no evidence here suggests otherwise, the trend American identifies in the regulation has the same tendency in *every* fiscal year to assign or "trap" more than a proportional percentage of cap room, relative to the likely percentage of total care, in the fiscal year of a patient's admission, *whatever year it may be*, at the expense of the succeeding fiscal year.  American maintains that any suggestion that "inequity in one year will balance out in later years is demonstrably false" in that "surplus cap room ... allocated to American in FY 2005 is *forever trapped* in that year [because] there is no provision in the regulation allowing a carry-forward of such surplus cap room or any other mechanism for recapture."  (Pl. Surreply at 3 (emphasis original)).  It is true that American cannot apply any excess cap room it might have had for FY05 in order to make up for the cap liability it had for FY06.  But that would be true even if American's cap was calculated using the statute.  The more important point that American simply ignores is that the same trend in the regulation tending to *prejudice* American with disproportionately low cap room in FY06 for patients first admitted in FY05 has the identical tendency to *benefit* American in FY06 at the expense of fiscal year 2007 ("FY07") for patients first admitted in FY06.[14]  To be sure, such a situation repeatedly creates a *potential* for a "lower"

---

[14]Consider a hypothetical involving two "average" American patients, both admitted to the program on the same date, one year apart.  Patient "A" is admitted on September 10, 2005, and he remains in the program for 111 days, until December 30, 2005.  Although Patient A would have received about 47% (52 days) of his care during FY05 and about 53% (59 days) in FY06, the regulation would assign 100% of Patient A's cap allocation to FY05 because he entered the program before September 28,

aggregate cap amount relative to the statutory calculation for American in the "next" fiscal year, whatever it may be.  This is because any disproportionately low allocations relative to the percentage of care received for certain individual patients constantly need to be counterbalanced by higher than proportional cap room allocations for the same fiscal year associated with other patients.  But it is not true at all that American's 111-day average somehow implies that its FY06 aggregate cap number was necessarily or even likely lower under the regulation than it would have been under the statute because disproportionately low cap allocations for that fiscal year from some patients can quite clearly be balanced or even outweighed entirely by disproportionately high cap allocations from other patients coming into the program later. Moreover, this is demonstrably true irrespective of the provider's average length of stay.[15]

American's argument also proves too little because a provider's aggregate cap number, whether calculated under the regulation or the statute, is not a function of the average patient stay.  While American's average stay in excess of 70 days creates some tendency, on average, to

---

2005, the end of the prior "cap year."  Because American provided 53% of his care in FY06, it would have been entitled under the statutory cap calculation to an allocation of his one-year cap amount in the same "proportion" or percentage towards its aggregate cap for FY06.  Thus, American is prejudiced by the regulation's cap calculation of 0% to FY06 for Patient A.  But consider Patient B, who is also admitted on September 10, but in 2006, and he also stays in the program for 111 days, until December 30, 2006.  American would have thus provided only about 47% of his care in FY06 and would have been entitled under a proportional statutory calculation only to that percentage of his one-year cap allocation in FY06.  Nonetheless, under the regulation American would receive 100% of his one-year cap allocation for FY06.  Accordingly, American benefits under the regulation in FY06 with regard to Patient B's allocation to the same degree it was harmed by allocation for Patient A.  In other words, the 100% one-year cap allocation in FY06 for Patient B evenly balances the 0% allocated for Patient A.  To the extent that such coincidental timing and length of stay might seem contrived, consider that the 53% "under-allocation" for Patient A in FY06 would be at least offset by the 100% allocation for Patient B, regardless of how many days the latter ultimately spent in the program, provided that Patient B (a) commenced care prior to September 28, 2006 (the beginning of the "cap year" 2007) and (b) received the same or a greater percentage of his care in FY07 that Patient A received in FY06.

[15]Consider again the hypothetical "average" Patients A and B from note 14, *supra*.  Assuming again that they each entered the program on September 10, in 2005 and 2006, respectively, but this time each remains in the program for 180 days.  In such case, each patient would receive only about 33% (52 days) of care in the fiscal year of admission and 67% (128 days) in the subsequent fiscal year.  Nonetheless, under the regulation each patient would receive 100% of their respective cap allocations to the year of admission and nothing towards the subsequent year.  But again, the same cap offset discussed in note 13 would apply: American would be "shorted" cap room by 67% in FY06 for Patient A relative to a statutory calculation, but that is evenly balanced by the same percentage "excess" allocation in FY06 for Patient B.

allocate more cap room to the year of admission at the expense of the next year, it is merely that: a statistical *tendency* based on *averages*. American's aggregate cap amount, whether under the statute or under the regulation, is determined by *aggregating* the cap amounts for *each individual patient* in the program, based upon their *actual* record of care. Specifically, under the statutory method of allocation, the each patient's cap allocation depends only upon the number of days of care that each patient received in each fiscal year, while under the regulation the each patient's cap allocation depends only upon the date of admission. Whether American's aggregate cap for FY06 was higher under the regulation or the statute is a function of whether disproportionately low cap percentage allocations to FY06 under the regulation for individual patients is at least offset by disproportionately high cap percentage allocations to the same fiscal year for other individual patients. That question, in turn, depends upon three elements: (1) the number of individual patients in American's program during FY05, FY06, and FY07 that would have discrepancies between their respective cap amounts allocated to FY06 under the statute versus under the regulation; (2) when each individual patient was first admitted; and (3) how long each one stayed.

Viewing the issue more concretely, American could be *prejudiced* relative to its aggregate cap calculation for FY06 under the regulation by only two groups of patients:

(1)     those who were first admitted prior to September 28, 2005 (the start of the 2006 "cap year") and continued to receive care through November 1, 2005 (the start of FY06) or later; and

(2)     those who were first admitted between September 28, 2006 (the start of the 2007 "cap year") and October 31, 2006 (the end of FY06) and continued to receive care through November 1, 2006 (the start of FY07) or later.

27

As to each such patient, American would have necessarily provided at least some care in FY06 but would have been denied any cap allocation for that year under the regulation.  Each of the first group would have had his or her entire cap amount assigned to FY05 because they were first admitted prior to the start of the regulation's "cap year" beginning September 28, 2005, while each of second would have his or her entire cap amount assigned to FY07 because they were first admitted during the regulation's cap year beginning September 28, 2006.  However, American would stand to *benefit* under the regulation in its FY06 aggregate cap calculation in identical fashion from two other groups of patients:

> (1)     those first admitted between September 28, 2005 (the start of the 2006 "cap year") and October 31, 2005 (the end of FY05); and

> (2)     those who were first admitted prior to September 28, 2006 (the start of the 2006 "cap year") and continued to receive care through November 1, 2006 (the start of FY07) or later.

In these situations, the regulation allocates the *entire* cap amount to FY06 despite the fact that at least some of the care was actually provided in either FY05 (for the first group) or FY07 (for the second group).  One will note that the relevant deadline dates for the patients that would alternatively prejudice or benefit American in its FY06 aggregate cap calculation under the regulation are the same, but shifted to the prior or subsequent fiscal year, as the case may be.  One will also note that any American patient (again, assuming no care was provided by another hospice program) that was first admitted between November 1, 2005 (the start of FY06) and September 27, 2006 (the start of the 2007 "cap year") and did not receive care beyond October 31, 2006 (the end of FY06) is irrelevant to the prejudice/benefit inquiry because 100% of the cap allocation for each such patient would be assigned to FY06 under either the regulation or the

28

statute.

All that American has shown is that it had some unspecified number of patients admitted during FY05 on otherwise unspecified dates who also received care for some unspecified number of days in FY06 but for whom the regulation assigned no cap room to FY06.  Standing alone, that information, while indicating some abstract possibility of prejudice, does not even provide one quarter of the necessary equation.  It simply is not enough from which to find, without engaging in speculation, that American's cap liability would actually be any lower (or higher) in FY06 under the statute than it is under the regulation.  What we need to know here specifically is whether the *aggregation* of disproportionately low percentage cap allocations to FY06 for *all* of American's patients within the first two "prejudice" groups identified in the preceding paragraph is at least offset by disproportionately high percentage cap allocations to FY06 for *all* patients falling within the latter two "benefit" groups.  There is no way to say with any reasonable degree of certainty that such actually did or did not occur based on what is now before the court.[16]  "The burden of putting forth substantial evidence is not satisfied by mere speculation and guess work." *Chrysler Credit Corp. v. J. Truett Payne Co.*, 670 F.2d 575, 582 (11th Cir. 1982).  Accordingly, the court concludes that American fails to meet its summary judgment obligation to establish

---

[16]Consider two more hypothetical American patients "C" and "D."  Assume, for example, that Patient C is admitted to American's care on September 27, 2005 and she remains in the program for 212 days, until April 27, 2006.  American would be prejudiced by a cap allocation for him under the regulation because her entire cap allocation would go to FY05, notwithstanding that only 35 days (about 17%) of her care was provided in FY05.  But assume that Patient D is admitted several days after Patient C, say on September 30, 2005, and he stays in the program only 10 days, until October 9, 2005, and then suddenly dies.  All of Patient D's care is provided during FY05, but because of his date of admission (after the start of the cap year commencing September 28, 2005), his entire cap allocation is assigned to FY06.  The average stay for Patients C and D together is 111 days, American's average.  The 83% cap deficiency to American in FY06 associated with Patient C is *more than completely offset* by the 100% allocation of Patient D's cap room to FY06, because the cap amount for each patient is the *same* notwithstanding Patient D's stay was only about 5% of Patient C's stay.  While American the arrival of Patient D in this scenario might seem convenient, the court would note that the purpose of this hypothetical is merely to illustrate both (1) that a provider's average length of stay does not dictate the calculation of its aggregate cap for a particular fiscal year and (2) that it is not possible to say with reasonable certainty that American's aggregate cap for FY06 was likely lower under the statute based *solely* upon evidence that American provider had some unspecified number of patients like Patient C, who received some care in FY06 but were allocated no cap room in that year.

standing based upon a showing that the regulation resulted in a lower aggregate cap amount than would have existed under the statute, as has been alleged in the complaint.

### 2.     Standing Regardless of the Statutory Cap Calculation

American also makes an alternative legal argument in support of Article III standing at summary judgment.  Namely, American argues that standing is proven based solely upon the undisputed evidence that 42 U.S.C. § 418.309(b) was applied to American to calculate its aggregate cap FY06, which resulted in a determination of cap liability.  American thus contends that it is not necessary to show that the regulation resulted in a higher aggregate cap in FY06 than would have existed under the controlling statute.

In support, American relies primarily upon *Los Angeles Haven Hospice, Inc. v. Leavitt*, No. 1:08-cv-1879 (C.D. Cal. July 13, 2009) (memorandum opinion on the parties' motions for summary judgment) (unpublished) (hereinafter the "*Haven* slip op.").[17]  In that case, the plaintiff hospice provider filed an action seeking to invalidate the same regulation at issue here, 42 C.F.R. § 418.309(b)(1), on the same grounds urged by American, *i.e.*, that its cap room allocation method conflicts with that set forth in 42 U.S.C. § 1395f(i)(2)(C).  *Haven* slip op. at 1.  HHS, as here, argued that the plaintiff lacked Article III standing because "Plaintiff has not demonstrated how it would be any better off were the implementing regulation to follow precisely the Congressional directive to adjust the Medicare beneficiary count to reflect proportional care."  *Id.* at 4.  In disagreeing with HHS, the court stated as follows:

> [T]he court rejects Defendant's attempt to argue that Plaintiff lacks standing simply because it cannot show that any injury it might have suffered stems

---

[17]The *Haven* memorandum slip opinion on the cross-motions for summary judgment, entered July 13, 2009, is Doc. 26-2.

entirely from 42 C.F.R. § 418.309(b).  Obviously there can be multiple causes of
an Article III injury.  *Cf. Larson v. Valentine*, 456 U.S. 228, 243 n.15 (1982)
(noting, for purposes of redressability analysis, that a plaintiff "need not show that
a favorable decision will relieve his every injury") (emphasis original).

     Defendant understands the injury in fact concept too narrowly in these
circumstances.  The injury in fact in this context (if Plaintiff's statutory argument
has merit) is the fact that HHS is operating an invalid regulation, leading to
accounting and payment inaccuracies.  Thus, the injury in question here is not
whether Plaintiff's liability is greater under the operation of section 418.309 than
it would be under some other regulation.  There is no other regulation.  That is
always true when a party challenges an allegedly invalid regulation.  *Cf. Regents
of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 280-81 n.14 (1978) (rejecting
argument that standing depended upon whether medical school applicant could
show that he would have been admitted but for the challenged affirmative action
admissions program); *Village of Arlington Heights v. Metropolitan Housing Dev.
Corp.*, 429 U.S. 252, 261-62 (1977) (holding that standing existed even though
there was no guarantee that plaintiff would successfully obtain goal if requested
relief were granted); *West Virginia Assoc. of Comm. Health Ctrs. v. Heckler*, 734
F.2d 1570, 1574-76 (D.C. Cir. 1984); *Samaritan Health Ctr. v. Heckler*, 636 F.
Supp. 503, 512 (D.D.C. 1985) ("The plaintiffs have demonstrated in
uncontroverted affidavits that they are among the intended beneficiaries of the
disproportionate share provision.  Since they are therefore arguably qualified to
receive an adjusted prepayment, 'they need not shoulder the additional burden of
demonstrating that they are certain to receive funding.'") (quoting *West Virginia
Assoc. of Comm. Health Ctrs.*, 734 F.2d at 1576).  *But see cf. Matter of
Extradition of Lang*, 905 F. Supp. 1385, 1397-98 (C.D. Cal. 1995) (rejecting mere
unconstitutionality as an injury in fact where plaintiffs "seek to be reevaluated
under a new system, even though there is no indication that they were harmed by
the old one"); *Fernandez* [*v. Brock*, 840 F.2d 622, 628 (9th Cir. 1988)]
(concluding that redressability lacking where plaintiff farmworkers could not
know what any regulations would say and could not predict whether employer
would continue to offer pension plan at all).

     To require the plaintiff in such a circumstance to somehow devise their
own proposed regulation which they believe comports with Congress's precise
statutory directive would send the parties and the court scurrying down the rabbit
hole to Wonderland.  If Defendant is concerned about advisory opinions, it seems
odd that it would require everyone involved - including the Court - to engage in
such a speculative exercise.  This understanding of the standing question as it
relates to this case is consistent with the Supreme Court's guidance where the
plaintiff is itself an object of the government action (as is clearly the case here)
"there is ordinarily little question that the action ... has caused [it] injury, and that

a judgment preventing or requiring the action will address it.  Lujan, 504 U.S. at
561-62.

*Haven*, slip op. at 4-6 (footnote omitted).  The *Haven* court then proceeded to the merits,

whereupon it concluded that the regulation's calculation method does indeed conflict with the

plain language of the controlling statute.  *Id.* at 6-8.  Accordingly, the *Haven* court subsequently

issued a judgment declaring the regulation invalid, setting aside the calculation of the plaintiff's

cap liability for the fiscal year in question, and remanding the matter to the Secretary to

recalculate the plaintiff's cap liability in accordance with the statute.  *Haven, supra* (C.D. Cal.

Aug. 17, 2009) ("Final Judgment and Remand Order") (unpublished).[18]

HHS responds that other district court decisions have concluded that a hospice provider

lacks Article III standing to challenge 42 C.F.R. § 418.309(b)(1) absent a showing that use of the

statutory calculation would have resulted in a higher cap amount for the fiscal year at issue.

HHS cites two cases: *Heart to Heart Hospice, Inc. v. Leavitt*, No. 1:07-cv-289-M-D, 2009 WL

279099, *6 (N.D. Miss. Feb. 5, 2009) (unpublished), and *Sojourn Care, Inc. v. Leavitt*, No. 07-

CV-375-GKF-PJC (N.D. Okla. filed March 3, 2009) (unpublished).[19]   Neither case, however,

appears actually to rest on Article III grounds.  In both, the court acknowledged that HHS had

disputed the plaintiff provider's standing, but neither court ever expressly stated that standing

was lacking.  Nor did either court "dismiss" the complaint without prejudice for lack of subject

matter jurisdiction, which is the proper disposition when a plaintiff is found to be without

standing.  *See Stalley ex rel. United States v. Orlando Regional Healthcare Syst., Inc.*, 524 F.3d

---

[18] The *Haven* "final judgment and remand" order, entered August 17, 2009, is Doc. 27-2.

[19] The *Sojourn* slip opinion is Exhibit B of the Secretary's Evidentiary Submission, Doc. 19 at 11-18.

32

1229, 1234-35 (11th Cir. 2008); *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977)[20];

*Bereton v. Boutiful City Corp.*, 434 F.3d 1213, 1216 (10th Cir. 2006). The *Heart to Heart* court

also denied HHS's motion for summary judgment and affirmatively appears to have rejected the

standing challenge, stating, "Defendant argues that plaintiff lacks the basic standing to prosecute

this lawsuit, but it appears likely to this court that plaintiff would be able to establish that at least

part of the $1,592,213 amount which it was required to reimburse Medicare is attributable to

defendant's enforcement of the Medicare hospice cap." *Heart to Heart*, 2009 WL 279099 at *6.

The *Sojourn Care* court similarly recognized that the Article III standing question was

"problematic," *Sojourn Care*, slip op. at 5-6, but it too ultimately found that the plaintiff had

"presented adequate proof [of injury] to withstand [HHS's] summary judgment motion." *Id*. at 7.

Nonetheless, the court in each case arrived at what amounted to the same disposition: (1) denial

of all relief sought by the plaintiff with (2) a "remand" to the PRRB to allow the plaintiff an

opportunity to establish a factual record before that body regarding whether and in what amount

the plaintiff had suffered economic loss under the regulation relative to the statutory calculation,

with the chance to return to court thereafter if successful on that score. *See Heart to Heart*, 2009

WL 279099, at *6; *Sojourn Care*, slip op. at 7. The basis for such result in each case, however,

does not appear to have been a lack of Article III standing. Indeed, "[a] court not having

jurisdiction of the subject matter does not have jurisdiction to remand the case to an

administrative tribunal believed to have such jurisdiction. The only thing that a court can do

with such a case is to dismiss it." *Woodrum v. Southern Ry. Co.*, 750 F.2d 876, 884 (11th Cir.

---

[20]The decisions of the former Fifth Circuit handed down before October 1, 1981, are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

33

1985).  Rather, those cases seem to be based upon a narrow conception of the scope of the

judiciary's role in the administrative review context, colored, at least in *Heart to Heart*, by

prudential concerns over "second-guess[ing] policy decisions made by HHS or Congress," *Heart*

*to Heart*, at *6, particularly "in an area of the law which is rife with public policy and fiscal

concerns."  *Id.* at *4.[21]

While they do not appear to have been decided based upon Article III, the court agrees

with the result reached in *Sojourn Care* and *Heart to Heart*, insofar as they held that the plaintiff

was not entitled to any relief based upon the alleged invalidity of 42 C.F.R. § 418.309(b)(1) in

the absence of evidence that cap liability would be reduced if the provider's aggregate cap were

calculated using the method set forth in 42 U.S.C. § 1395f(i)(2)(C).  As the court will later

discuss, however, the court does not agree with those cases to the extent that they hold that the

lack of such evidence requires or counsels a remand to the PRRB to build an administrative

record on the issue.  Rather, the court concludes that such issue is not only appropriately litigated

in federal court but that evidence of some economic injury under the regulation relative to the

---

[21]Another case not cited by the parties, *Autumn Bridge, L.L.C. v. Sebelius* [No. CIV-08-819-F], (W.D. Okla. Aug. 10, 2009) (unpublished), is to the same effect as *Heart to Heart* and *Sojourn Care*.  While expressly declining to formally decide the question of Article III standing, that court too remanded the action to the PRRB to assess whether and to what extent the plaintiff was harmed in calculating its cap under the regulation, as opposed to under the statute.  *Autumn Bridge*, slip op. at 10-12.

In dicta, the court in *Compassionate Care* also suggests that it would also be in this same camp.  While holding that the allegations of the complaint were sufficient to establish standing at the pleading stage, it warned:

> Even though Plaintiff survives this challenge, it still must overcome obstacles before a determination about the validity of the regulation can be made.  Plaintiff must demonstrate that it was application of the regulation that led to the allegedly incorrect repayment demand.  If, as in [*Sojourn Care*], other issues also impacted the repayment decision, this matter will be remanded to the PRBB for consideration of those issues.

*Compassionate Care*, at *3.  By so stating, the court makes it clear that, before it will consider the merits of regulation's validity, the court would require the plaintiff to establish something *more* in terms of injury caused by the regulation.  That is, although it was entirely undisputed both that (1) the regulation had been applied to the plaintiff and (2) resulted in a determination of cap liability, the court indicated that such would *not* be enough for the plaintiff to be entitled to relief.  This court can only surmise that the further "demonstrat[ion]" required would entail proof that the regulation caused it to suffer economic injury relative to the statutory calculation, as the plaintiff had alleged in its complaint and as was required in *Sojourn Care*.  *See Autumn Bridge*, slip op. at 9.

statutory method of cap allocation is necessary here for a plaintiff provider to establish standing under Article III.  Accordingly, as further explained below, the court also rejects *Haven*'s holding that a hospice provider has standing on the theory that it has suffered a redressable injury-in-fact caused by the regulation without any showing that cap liability would be reduced under the statute.

The court concludes that American has suffered an injury-in-fact.  HHS, via the decision of the fiscal intermediary, has assessed American as owing $392,121 for exceeding its aggregate cap for FY06 by that sum.  The more difficult issues are whether American's injury was "caused" by the regulation and whether the injury is "redressable" for purposes of Article III in the absence of any showing that American's cap liability would be reduced under the statute.

American argues that causation is satisfied because the regulation was undisputedly applied directly to American in calculating its FY06 aggregate cap, resulting in its cap liability. American likewise asserts that invalidating the regulation and requiring HHS to use the statutory method of cap allocation will redress its injury by allegedly "mitigat[ing] American's cap problem."  (Plaintiff's Response to Defendant's Motion for Summary Judgment and Memorandum in Support ("Pl. Opp.")[22] at 5.)  In support of its argument, American relies, as did the *Haven* court, upon the Supreme Court's statement in *Lujan* that when "the plaintiff is himself an object of [challenged government] action (or foregone action) ... there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it."  504 U.S. at 561-62.  However, while *Lujan*'s dictum is a correct characterization of standing law, by its terms it states only a general principle of what is

---

[22]The Plaintiff's Response or "Opposition" Brief is Doc. 21.

"ordinarily" the case.  Its truth lies largely in that the fact that where a plaintiff is the object of challenged government action or inaction, one typically can readily discern the harm the plaintiff has suffered by comparing the plaintiff's present situation with what normally will be clearly and materially more favorable circumstances expected to exist upon entry of a judgment invalidating, and attempting to compensate for the effects of, the challenged action or inaction.[23]  American's challenge to 42 C.F.R. § 418.309(b)(1) does not fit that mold, however.  Assuming the regulation is set aside, American will still necessarily be subject to the aggregate cap established by the *controlling statute*, 42 U.S.C. § 1395f(i)(2).  Indeed, the crux of American's claim is that HHS *must* use the statute's method of allocation *instead of* the regulation's when calculating a provider's aggregate cap precisely because regulation's method conflicts with the unambiguous statutory language.  Nonetheless, American has failed to present evidence to this point even indicating that its liability will actually be any less at all under the statute than under the regulation.  Thus, on the record here, invalidation of the cap regulation does *not* imply that American would be free of *any* of the cap liability of which it complains or that American's circumstances would otherwise be at all tangibly improved.  Accordingly, even if American's cap liability is conceived as having been "caused" by an application of the regulation, it nonetheless cannot be said that a favorable decision would "redress" the injury in any meaningful way because it is entirely speculative at this point that relief fashioned by the court would make American any better off.

---

[23]For instance, where challenged governmental action has imposed certain obligations or restrictions upon the plaintiff, *e.g.*, a tax, registration or reporting requirements, limits on campaign donations, or limits on the receipt of Medicare reimbursements, redress will include invalidation of the government action such that the plaintiff would then be free of the associated legal restraint and thus might act without the encumbrance.  That is, to use the same examples, the plaintiff would not have to pay the tax, comply with reporting or registration duties, or could contribute additional money to a campaign, because the law no longer imposes the restraint or obligation upon the plaintiff.

The *Haven* court suggests that any attempt at relative comparisons between the regulation's cap calculation and "some other" would be necessarily speculative to the point of absurdity, sending all involved "scurrying down the rabbit hole to Wonderland." *Haven*, slip op. at 5. This court does not agree. Such would supposedly be the case, according to *Haven*, because "[t]here is no other regulation," and providers cannot be expected "to somehow devise their own regulation which they believe comports with Congress's precise statutory directive." *Id.* at 4-5. *Haven* is of course correct that there is no other *regulation*, but what its analysis ignores is that the crux of the provider's claim there, as here, was that the regulation is invalid precisely because it conflicts with the *specific method* of cap allocation affirmatively asserted by the plaintiff provider to be *dictated by the existing, controlling statute*. Indeed, the *Haven* court itself concluded that the statute unambiguously and specifically commands a proportional division of each patient's cap allocation across fiscal years, stating:

> Congress unquestionably required that the number of medicare beneficiaries be reduced to reflect "the proportion" (not simply a proportion or an estimate ...) of hospice care that "each such individual" (not individuals in the aggregate) "was provided in a previous or subsequent accounting year." The regulation in question runs counter to that directive. Congress has "directly spoken" to this "precise question." *Chevron* [*U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984)]." "[T]hat is the end of the matter." *Id.*

*Haven*, slip op. at 7-8 (some citations omitted). Because the *Haven* court acknowledged that the statute provided a specific and distinctly different method of cap allocation, its expressions of concern that a comparison between cap liability calculated under the regulation to "some other" method would be unduly speculative are unconvincing.

American still argues, however, that it need not show that its liability would be reduced under a statutory calculation of its cap on the theory that a plaintiff "need not show that a

favorable decision will relieve his every injury," (Pl. Opp. at 2, quoting *Larson v. Valente*, 456

U.S. 228, 243 n.15 (1982)).  American, as did the court in *Haven*, also points the Supreme

Court's decision in *Bakke*, emphasizing that the Supreme Court there held that a white male

denied admission to a state university medical school had standing to challenge the school's

affirmative action admissions program even if he could not show he would have been admitted

absent that program.  *See* 438 U.S. at 280 n.14.  It is true that what amounts primarily to a

*procedural* injury, based upon a defendant's application of an unlawful rule or consideration in

its decisionmaking affecting the plaintiff's interests, may be sufficient in some circumstances to

satisfy Article III, notwithstanding that it is at least uncertain or even doubtful that the plaintiff

has suffered or will likely suffer any substantive or tangible harm as a result of the procedural

impropriety.  For example, the Supreme Court has found that plaintiffs have standing to assert an

equal protection challenge to a discriminatory rule or policy impacting competition or eligibility

for a government benefit.  This may be so even absent a showing that the plaintiff would have

been, or likely will be, granted the benefit but for the use of the challenged rule or policy,

provided that the plaintiff applied for the benefit and was denied or was ready, able, and intended

to apply in the relatively near future.  *See, e.g., Bakke*, 438 U.S. at 280 n.14; *Gratz v. Bollinger*,

539 U.S. 244, 260-62 (2003); *Northern Fla. Chapter, Associated Gen. Contractors of Amer. v.

City of Jacksonville*, 508 U.S. 656, 666 (1994); *see also Heckler v. Mathews*, 465 U.S. 728, 739-

40 (1984) (male plaintiff held to have standing to contest, on equal protection grounds, law

discriminating on the basis of sex in connection with eligibility for a benefit under the Social

Security Act, even though a favorable judicial decision would necessarily only eliminate the

availability of the benefit entirely rather than extend eligibility to the plaintiff).  Courts also

routinely hold that a defendant's failure to follow procedural requirements imposed by

environmental protection statutes may afford standing even though it is at best uncertain that

procedural compliance would or will ultimately prevent the substantive action alleged to threaten

the plaintiff's concrete interest.  *See, e.g., Massachusetts v. E.P.A.*, 549 U.S. 497, 517-18 (2007);

*Lujan*, 504 U.S. at 572 & nn. 7 & 8; *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1172-73

(11th Cir. 2006).  Courts have also found standing based upon a defendant's failure to comply

with statutory duties that potentially caused harm to the plaintiff's economic interests, despite the

possibility that the discretionary authority of the defendant, its agents, or even other

governmental decisionmakers might still result in denial of the substantive benefit sought in the

lawsuit.  *See, e.g., Bennett v. Spear*, 520 U.S. 154, 168 (1997) (plaintiffs had standing to

challenge Fish and Wildlife Service's "Biological Opinion" regarding impact of project on

endangered species notwithstanding that Bureau of Reclamation formally retained responsibility

for determining whether and how a proposed action shall go forward); *Watt v. Energy Action

Educational Found.*, 454 U.S. 151, 160-62 (1981) (California had standing to challenge the

Secretary of the Interior's failure to carry out statutory duty to test various bidding systems in

connection with program to lease tracts for oil and gas exploration; California had a direct

financial stake in higher lease revenues, and redressability was met despite that a favorable

decision would not compel Secretary to use non-cash-bonus systems as desired by California);

*West Virginia Ass'n of Community Health Ctrs., Inc. v. Heckler*, 734 F.2d 1570, 1574-75 (D.C.

Cir. 1984) (association of community health centers in West Virginia had standing to assert claim

against HHS with respect to calculation of funding to which that State was entitled under primary

care block grant statute, even though association members were not certain to benefit insofar as

the State would retain discretion regarding how to allocate any additional funding); *Samaritan Health Center v. Heckler*, 636 F. Supp. 503, 512 (D.D.C. 1985) (hospitals had standing to compel HHS to fulfill statutory duty to enact regulations defining "exceptions and adjustments" to Medicare payment program "to take into account the special needs ... of public or other hospitals that serve a significantly disproportionate number of patients who have low income or are entitled to [part A Medicare] benefits," even though the plaintiff ultimately still might not receive additional payments because of HHS's discretion in crafting eligibility standards under any such regulations).

　　The Supreme Court has also held that plaintiffs had standing to challenge an allegedly racially discriminatory zoning decision that precluded plaintiffs from constructing or obtaining low-income housing although other contingencies, such as the builder's being deemed qualified for financing and federal subsidies, would still have to occur for the project to be completed. *Village of Arlington Heights v. Metropolitan Housing Development*, 429 U.S. 252, 261-64 (1977).  Finally, the Supreme Court has indicated that standing may exist to attack the constitutionality of a particular legal rule invoked to justify the denial of a benefit, even though such benefit might still be denied by the defendant based upon a yet-to-be litigated alternative legal ground.  *See Larson*, 456 U.S. at 238-44 (where Minnesota statute imposed registration and reporting requirements upon charitable organizations but created an exemption for religious organizations receiving at least fifty percent of funding from members, putative church organization had standing to bring First Amendment challenge to the "fifty percent" aspect of the exemption, notwithstanding that organization might still later be denied the exemption on the ground that it did not qualify as a "religious organization" under the statute).

40

The undersigned, however, finds those types of cases to be distinguishable from the instant one.  This is case obviously does not involve either an equal protection challenge or an expressly granted procedural right under an environmental statute, the two contexts in which a primarily procedural injury is most often deemed to confer standing.  But even looking at the foregoing procedural-injury cases more broadly, in each one, the causation and/or redressability elements of standing were cast in doubt by the existence one or more obstacles of a decidedly *abstract* and *indefinite* nature that, with some greater or lesser degree of uncertainty, could possibly stand in the way of the plaintiff securing a tangible benefit, even if the court abated the defendant's challenged conduct, policy, or rule.  For example, in some it was a mental process of subjective or discretionary decision-making, either in the past or in the future, that could be expected potentially to involve consideration and weighing of a host of legitimate factors (both objective and subjective) and/or an authorized exercise of discretionary choice.  Likewise, in others other uncertain future events or yet-to-be-resolved legal issues could possibly stand in the way of the plaintiff obtaining the benefit.  Given the *inherently subjective* and *abstract* nature of these "other" uncertain potential impediments to securing a tangible benefit, it was sensible for the courts to conclude that the granting of judicial relief eliminating the obstacle represented by the defendant's unlawful conduct would still be sufficiently meaningful and substantial, given nature of both the plaintiff's interest and the right sought to be vindicated.

While there is also some element of "uncertainty" involved here in American's ability ultimately to secure a tangible benefit in the form of a reduction or elimination of its cap liability, it is qualitatively different in nature.  The only "uncertainty" here is whether American's aggregate cap amount and its associated liability for FY06 would be less using the statutory

method of assigning cap room for each patient.  While the parties have, for whatever reason, failed to present evidence establishing those matters, they are not inherently subjective, abstract, or indefinite by nature.  Rather, they are distinctly concrete and definite; indeed, they appear capable of ascertainment with relative mathematical precision *right now* based upon historical information that is presumably discernable from the records of American's relevant patient population, *i.e.*, the dates upon which care was provided to each patient, which would then be used to establish proportional percentages of care provided in each fiscal year in applying the statutory method of allocation.

When faced with similar situations in which the plaintiff has urged that a specific method of calculation or allocation is unlawful, courts appear to take the position that a plaintiff will have standing only if he is able to prove that the challenged method has resulted, or will with reasonable certainty result, in tangible harm to the plaintiff relative to the use of a pre-existing, otherwise required, or other alternative method of calculation or allocation.  For example, in *Catholic Social Service v. Shalala*, 12 F.3d 1123 (D.C. Cir. 1994), a group of home health care providers challenged an HHS regulation changing the method by which compliance with specified service "reasonable cost" limits would be determined.  HHS challenged the plaintiffs' standing to bring the action, but the D.C. Court of Appeals disagreed, recognizing that, to the extent that the plaintiffs were asserting that the new rule was void *ab initio*, they would have suffered a cognizable Article III injury because "they would be entitled to greater reimbursement ($5 million more) from the government *per the pre-rule cost-limit methodology*" than under the new rule.  *Id.* at 1125 (emphasis added).  In a somewhat different but related Medicare context, the Fifth Circuit held in *American Med. Ass'n v. Bowen*, 857 F.2d 267, 272 (5th Cir. 1988), that

physicians lacked standing to challenge HHS's adoption of a regulation establishing a "median" method for calculating maximum allowable actual charges. The court acknowledged that such a method would likely lead to lower charges for some physicians than if an alternate "weighted average" method, also referenced in the controlling statute and preferred by the plaintiffs, were used. *Id.* HHS had expressly stated in promulgating the median method adoption regulation that it would not pursue any enforcement actions provided that a physician did not actually exceed charges under the weighted average method. *Id.* Accordingly, the court concluded that no physician had been actually been required to charge a lower fee so as to cause injury as a result of HHS's action. *Id.* *Also cf. Clajon Production Corp. v. Petera*, 70 F.3d 1566, 1573-74 (10th Cir. 1995) (ranchers' allegation that Wyoming's residency-based scheme for allocating hunting permits impaired their ability to attract non-resident hunting customers was insufficient to confer standing absent evidence that the scheme was actually causing fewer nonresidents to hunt in Wyoming than would do so under some alternative allocation scheme, such as a general lottery that included all applications for hunting permits).

Where this type of approach has been most visible, however, has been in the numerous cases in which plaintiffs have challenged methods of conducting the census or otherwise calculating or allocating the population for purposes of apportioning legislative representatives or distributing public funding. The analysis in such cases firmly establishes that Article III requires a plaintiff to show that the challenged method of counting or allocation has caused or likely will cause the plaintiff to suffer tangible harm relative to the allocations that would have been or likely would be made using existing, required, or some proposed alternative method. *Compare Utah v. Evans*, 536 U.S. 452, 458-461 (2002) (Utah had standing to challenge "hot deck

imputation" method of supplementing census data which undisputedly would have shifted a Congressional Representative from Utah to North Carolina); *Department of Commerce v. United States House of Representatives*, 525 U.S. at 330-34 (Indiana resident plaintiffs had standing to challenge the use of statistical sampling in census where expert testimony showed, and the government failed to materially dispute, that Indiana would lose a congressional representative if sampling were used); *Tucker v. United States Dept. of Commerce*, 958 F.2d 1411, 1415-16 (7th Cir. 1992) (holding requirements of Article III were met in a challenge to the validity of the census because the plaintiffs has sufficiently alleged "some probability of a tangible benefit from winning the suit"); *and City of Willacoochee, Ga. v. Baldridge*, 556 F. Supp. 551, 553-54 (S.D. Ga. 1983) (holding that city had standing to challenge census methodology that allegedly undercounted city's population insofar as such would effectively decrease public funding) (cited with approval in *Chiles v. Thornburgh*, 865 F.2d 1197, 1209 (11th Cir. 1989)), *with Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (O'Connor, J.) (plurality opinion) (Massachusetts plaintiffs had standing to challenge decision to count overseas military personnel in census data because State would have gained one representative in Congress if such personnel were not counted at all; however, plaintiffs lacked standing to challenge as "inaccurate" the use of "home of record" data to determine the state of residence for such personnel, where plaintiffs failed to show that State "would have had an additional Representative if the allocation had been done using some other source of 'more accurate' data); *Wright v. Dougherty County, Ga.*, 358 F.3d 1352, 1355 (11th Cir. 2004) (holding that plaintiffs residing in an over-represented district lacked standing to challenge legislative apportionment scheme because Article III "'injury results only to those persons domiciled in the under-represented voting districts'" (quoting *Fairley v.*

44

*Patterson*, 493 F.2d 598, 603 (5th Cir. 1974)); *National Law Center on Homelessness and Poverty v. Kantor*, 91 F.3d 178, 183 (D.C. Cir. 1996) (homeless advocacy organizations lacked standing to challenge particular method used to supplement count of the homeless in the census, where the plaintiffs were unable to "show that the homeless were improperly undercounted by the [challenged] methodology as compared to a feasible, alternative methodology"(citing Justice O'Connor's plurality opinion in *Franklin*, *supra*)); *Sharrow v. Brown*, 447 F.2d 94, 96-97 (2d Cir. 1971) (New York resident lacked standing to challenge the failure to reduce state census counts used in allocating Representatives in Congress in the proportion of males aged at least 21 years in each state that were denied the right to vote, as required under Section 2 of the Fourteenth Amendment, where the plaintiff failed to present any evidence indicating that New York would gain a seat in Congress if such adjustment were made); *Federation for American Immigration Reform v. Klutznick*, 486 F. Supp. 564, 570 (D.D.C.), appeal dismissed, 447 U.S. 916 (1980) (plaintiffs lacked standing to challenge failure to exclude illegal aliens in conducting the census where they could do no more than speculate as to whether their own states might gain or lose representation by the sought adjustment); *and Ridge v. Verity*, 715 F. Supp. 1308, 1313 (W.D. Pa. 1989) (same).

Neither American nor the *Haven* court that accepted the same arguments American now makes has been able to cite, and the court's own research fails to reveal, any case (other than *Haven* itself) in which Article III standing has been found to exist where a plaintiff sought to attack a particular method of allocation or calculation used by the government as unlawful without making a showing of at least a probability of tangible injury in relation to an existing, required, or proposed alternative method. It may be that neither *Catholic Social Service*, the

45

Fifth Circuit's *AMA* case, nor the population apportionment cases present a perfect parallel for determining whether American has standing.  Nonetheless, the undersigned finds them sufficiently analogous to support that American has failed to establish its standing because it has not presented evidence that there is a reasonable probability that its FY06 cap liability using the statutory method of allocation would, in fact, be reduced at all relative to its existing liability as determined under the challenged regulation.  American has thus failed to establish at least the element of redressability, for the court fails to see how the judicial relief potentially available to American would actually be substantial or otherwise meaningful.

American complains that if it is deemed to lack standing, it will have no effective means of challenging what it says is a patently unlawful regulation being applied to it and all other hospices around the country.  However, "[a]n asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." *Allen v. Wright*, 468 U.S. 737, 754 (1984).  American is constitutionally required to establish all three elements of Article III standing in order to pursue its claim, including redressability, and it has not done so to this point.  Accordingly, American's motion for summary judgment is due to be denied.

### B.      Remand to the PRRB

HHS next argues in its motion for summary disposition that, even if American has standing, no relief should issue and the action should be immediately remanded to the PRRB. (Dft. Mem. at 25; Dft. Reply at 5).  In support, HHS relies upon *Sojourn Care* and *Heart to Heart*, where remands to the PRRB were ordered  for further factfinding on whether American's cap liability would be reduced under a statutory recalculation.  The court also notes that, although

not cited by HHS, such a remand was also ordered in *Autumn Bridge, L.L.C. v. Sebelius* [No.

CIV-08-819-F], (W.D. Okla. Aug. 10, 2009) (unpublished), and that the court in *Compassionate*

*Care* hinted that it also would do likewise unless the provider would later offer evidence of

economic injury under the regulation relative to the statute.  American contends that remand to

the PRRB is constitutionally prohibited on the theory that determining whether a plaintiff has

Article III standing and determining jurisdictional facts upon which such standing would depend

is a judicial function that cannot be delegated to an administrative agency or to an adverse party.

(Pl. Surreply at 4-6).  The court agrees that a remand to the PRRB is not appropriate at this time,

although not for the constitutional reasons urged by American.

American contends that a remand to the PRRB is prohibited because it implies an

unconstitutional delegation to that body or to HHS to determine American's Article III standing.

The court here assumes that neither the PRRB nor HHS could, in fact, determine a provider's

standing to proceed in federal district court, because neither the PRRB nor HHS has been granted

any such power by statute or regulation and/or because making such a determination, at least if

deemed final, is an essential judicial function that may not be delegated to a non-Article III

institution.  *See generally Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50

(1982); *Crowell v. Benson*, 285 U.S. 22 (1932).  However, the respective remands ordered in

*Heart to Heart* and other cases clearly do not even ask, never mind require, the PRRB or HHS to

decide, either conclusively or even preliminarily, the legal issue of whether the plaintiff provider

has Article III standing to proceed in the district court.  Rather, they each involve a return to the

agency only for purpose the taking of evidence and making factual findings regarding the

existence and extent of the provider's alleged injury, which might, in turn, underlie a district

court's examination and disposition of the legal issue of Article III standing, should the case thereafter come back to court.  *See Heart to Heart*, at *6; *Sojourn Care* slip op. at 7; *Autumn Bridge* slip op. at 11.

American argues, however, that even having the PRRB perform such a factfinding function is prohibited because, American says, "vesting an agency with the power to determine facts of *constitutional* importance (such as jurisdiction) robs the district court of the 'essential attributes' of judicial power, and is thus prohibited by Article III."  (Pl. Surreply at 5, citing *Crowell*, 285 U.S. at 56-57 (emphasis original)).  Again, the court disagrees.  Just as there is nothing in *Heart to Heart* or the other remand cases that asks the PRRB or HHS to determine American's Article III standing, there is also nothing in those cases that purports to commit to the agency the right to *conclusively* establish any fact, as it might relate to the district court's jurisdiction or otherwise.  Indeed, any factfinding that the PRRB might do on HHS's behalf on remand would be subject, at a minimum, to judicial review under the standards of the APA.  *See* 42 U.S.C. § 1395oo(f)(1); 5 U.S.C. § 706.  But even assuming that separation of powers principles might imply that a stricter standard should apply to review of agency findings related to jurisdictional facts, there is nothing preventing a district court from applying whatever legal standard is required, up to and including a de novo examination, to whatever evidence and factfinding that might be adduced by the PRRB.  Accordingly, the court concludes that American's argument that remand to the PRRB is constitutionally prohibited is without merit.

The foregoing notwithstanding, the court is also not persuaded by the reasoning of *Heart to Heart* or the other PRRB remand cases.  None of those opinions cited any statute, regulation, case, or any other legal authority purporting to justify the remand disposition.  The *Heart to*

48

*Heart* court was the first one to order a remand, but its grounds for doing so were essentially *ad hoc*; it discerned certain "public policy and fiscal concerns" implicated by the provider's challenge to 42 C.F.R. § 418.309, including that the cap seemed to prove a greater burden to hospices operating for profit and to ones located in certain regions of the country, and the court concluded summarily that such matters would be "better addressed, after extensive hearings and inquiry, by the HHS and/or Congress." *Heart to Heart*, 2009 WL 279099, *4. Approximately one month later, the *Sojourn Care* court likewise remanded its action to the PRRB based upon the plaintiff's failure to present proof that its cap liability would be lessened under the statute, although that court also did not cite any supporting legal authority. *See Sojourn Care* slip op. at 7; (*see also* Admin. Rec. at 73). The next case, *Compassionate Care*, suggested that any remand it might subsequently order would be grounded upon *Sojourn Care*, see 2009 WL 2163503, *3, while the most recent remand case, *Autumn Bridge,* did so essentially in reliance upon *Heart to Heart*, *Sojourn Care*, and *Compassionate Care*.

To the extent that *Heart to Heart* or these other cases attempt to justify remand because the provider's challenge to the regulation might involve "public policy and fiscal concerns," *Heart to Heart* at *4, or "an exceptionally technical and policy-laden subject," *Autumn Bridge* slip op. at 11, the undersigned is unmoved. While federal courts are generally required to afford deference to HHS's expertise relative to implementation of complex and technical Medicare statutes, courts are not bound by HHS's interpretation of such statutes and they "must not abdicate [their] responsibility to review an agency's construction that is alleged to be inconsistent with the statutory mandate." *Sarasota Memorial Hosp. v. Shalala*, 60 F.3d 1507, 1511 (11th Cir. 1995) (citation and internal quotation marks omitted). "[U]nder the Constitution, one of the

49

Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones." *Japan Whaling Ass'n v. American Cetacean Soc.*, 478 U.S. 221, 230 (1986).

Assuming that standing and jurisdiction otherwise exist, the duty and task of the courts in these cases is nothing more or less than to answer a straightforward question of statutory interpretation under the standards set forth in *Chevron U.S.A., Inc.  v. Natural Resources Defense Council*, 467 U.S. 837 (1984): Is the method of cap allocation prescribed by 42 C.F.R. § 418.309(b)(1) irreconcilable with the terms of the statute it purports to implement, 42 U.S.C. § 1395f(i)(2)(C)?  *See generally Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 418-19 (1993) ("Where, as here, the statute expressly entrusts the Secretary with the responsibility for implementing a provision by regulation, our review is limited to determining whether the regulations promulgated exceeded the Secretary's statutory authority and whether they are arbitrary and capricious." (quoting *Heckler v. Campbell*, 461 U.S. 458, 466 (1983) (footnote and citations omitted)).  If the regulation's method conflicts with the statute's, this court must declare the regulation's method invalid *and then* remand the case to the agency for reconsideration of its action.  *See, e.g., Haven, supra*; *see also Pollgreen v. Morris*, 770 F.2d 1536, 1544 (11th Cir. 1985).  "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.  If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron*, 467 U.S. at 843 n.9 ((citations omitted); *see also Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461-62 (2002). If, on the other hand, the regulation does not conflict, then it is valid and due to be given

effect.  *See Chevron*, 467 U.S. at 843 ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."); *id.* at 844 ("[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.").

In none of these cases does the validity of the regulation depend in whole or in part on what a federal court might think to be the best, wisest, or most efficient way to allocate patient cap room or calculate the cap.  *See, e.g., Atlantic Mut. Ins. Co. v. C.I.R.*,  523 U.S. 382, 389 (1998) ("Since the [statutory] term ... is ambiguous, the task that confronts us is to decide, not whether the [regulation] represents the best interpretation of the statute, but whether it represents a reasonable one.")  Such public policy choices are not the domain of the judiciary; the role of the courts in this context is simply to discern and enforce the policy choices made by Congress and by HHS, provided that the latter's action does not conflict with the expressed will of Congress. *See Chevron*, 467 U.S. at 866 ("[F]ederal judges-who have no constituency-have a duty to respect legitimate policy choices made by those who do"); *F.E.C. v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 30 (1981) ("[I]n determining whether the Commission's action was 'contrary to law,' the task for the Court of Appeals was not to interpret the statute as it thought best but rather the narrower inquiry into whether the Commission's construction was 'sufficiently reasonable' to be accepted by a reviewing court.") (citations omitted)).

Nor is the court persuaded that a remand to the PRRB might be warranted because of potential issues concerning why the hospice cap seems to burden certain types of providers more than others, *see Heart to Heart* at *4-5, or whether a plaintiff's cap liability might have been caused in part by "other issues" or reasons besides the regulation, *Compassionate Care* at *3.

51

Frankly, this court does not view such considerations as material to any issue before it.  As already explained, whether a plaintiff's cap liability as calculated under the regulation would be reduced by using the statutory method of allocation and by how much are important because they go to standing, in particular the existence and extent of injury caused by the regulation. However, any other "issues" or "reasons" that might underlie why any provider exceeded its cap are inconsequential. First, the only illegality alleged in these cases is in the regulation's method of allocating all cap room for each patient to a single fiscal year notwithstanding that at least some amount of their care was actually provided in another fiscal year.  Any other factors that might cause or contribute to the circumstance that a given provider has exceeded its cap or by what amount are irrelevant because any legal rule or policy giving rise to the other factor is not claimed to be unlawful.  Second, any such "other" issues or reasons would relate to the wisdom of establishing a cap and its appropriate scope and terms of application.  Such policy choices are for the political branches to make and are not subject to second-guessing by the courts.  Third, and finally, "other" issues or reasons like the average number of days that a provider's patients received care, *see Sojourn Care* slip op. at 7, do not matter because they relate solely to potential reasons for *increases* in a provider's total *reimbursement*, not to the provider's aggregate cap number.  As previously discussed, the more a provider bills per patient to Medicare, the greater the chance that the provider will exceed its aggregate cap, whether calculated under the regulation or the statute.  But the provider's reimbursed billing is the "front end" of the cap liability equation, while all that matters here is the "back end," *i.e.*, the aggregate cap number, because it represents the limit of how much of the total reimbursed billing, *regardless of how high it is*, that the provider may keep.

Ultimately, a remand to the PRRB is neither required nor warranted because the PRRB did exactly what it was supposed to do in this case and any issues of proof regarding the existence and extent of American's injury under the regulation relative to the statutory calculation are properly tried in this court.  It must be recalled that this court is *not* being asked to review the decision of the *PRRB* in American's case.  Indeed, the PRRB made no substantive decision and took no substantive action at all here.  The PRRB did conclude that it had jurisdiction under 42 U.S.C. § 1395oo(a) to hear American's claim disputing the determination of the *fiscal intermediary* demanding that American refund $392,121 for having exceeded its aggregate cap for FY06 by that amount.  However, the PRRB recognized that, because American's claim was based solely upon a challenge to the validity of 42 C.F.R. § 418.309(b)(1), it lacked the authority to resolve the claim given that it is bound by the regulation.  S*ee* 42 C.F.R. § 405.1867.  The PRRB thus granted expedited judicial review without conducting a hearing or any other proceedings.  *See* 42 U.S.C. § 1395oo(f)(1) and 42 C.F.R. § 405.1842.  Accordingly, judicial review here is of an "action of the *fiscal intermediary* which involves a question of law or regulations relevant to the matters in controversy" following a PRRB determination "*that it is without authority to decide the question ... .*"  42 U.S.C. § 1395oo(f)(1) (emphasis added); *see also Tallahassee Mem. Reg. Med. Ctr.*, 815 F.2d at 1461.

*Heart to Heart* and the other cases remanding to the PRRB are founded upon an implicit assumption that, before a provider's challenge to 42 C.F.R. § 418.309(b)(1) is ripe for judicial review under 42 U.S.C. § 1395oo(f)(1), the PRRB is to have taken evidence and engaged in factfinding regarding whether and, if so, by what amount the plaintiff's cap as determined by the fiscal intermediary under the regulation would have been increased had the cap allocation

method of 42 U.S.C. § 1395i(f)(2)(C) been used instead.  The court disagrees with that

proposition.  The merits of American's claim depend entirely upon the resolution of a pure issue

of law, namely, whether the regulation conflicts with the controlling statute.  Against the

backdrop of the PRRB's limited authority, unless and until a court enters a judgment decreeing

the regulation's method of cap allocation invalid, any hearings or factfinding into any the

provider's cap as calculated under the statute is an utterly academic exercise as far as the PRRB

is concerned.  Even if the PRRB were to find that applying the statute's method of cap allocation

would *completely eliminate* American's $392,121 liability as calculated under the regulation, *the*

*PRRB still could do nothing because it is bound to follow the regulation*.  That is precisely why

the PRRB granted American's request for expedited judicial review in the first place.  The

prospective futility of administrative proceedings is a proper consideration in determining

whether or not an action should be remanded to the PRRB for further administrative proceedings

prior to resolution of questions of law.  *Hospital Ass'n of Rhode Island v. Secretary of HHS*, 820

F.2d 533, 539 (1st Cir. 1987); *see also Morgan Stanley Capital Group Inc. v. Public Utility Dist.*

*No. 1 of Snohomish County*, ___ U.S. ___, ___, 128 S.Ct. 2733, 2745 (2008) ("'To remand

would be an idle and useless formality.  [Our precedent] does not require that we convert judicial

review of agency action into a ping-pong game.'" (quoting *NLRB v. Wyman-Gordon Co.*, 394

U.S. 759, 766-67, n. 6 (1969) (plurality opinion)).

        The only reason that *Heart to Heart* and the other cases seem to have ordered a remand is

for purposes of building an administrative record to establish the plaintiff's Article III standing to

proceed with judicial review under 42 U.S.C. § 1395oo(f)(1).  However, as American's

arguments against remand tangentially recognize, it is not necessary for the PRRB or HHS to

even concern itself with whether a plaintiff can establish Article III standing, even in proceedings

before the agency, never mind in a yet-to-be filed court proceeding.  "Administrative

adjudications ... are not ... article III proceeding[s] to which either the 'case or controversy'

or prudential standing requirements apply; within their legislative mandates, agencies are free to

hear actions brought by parties who might be without standing if the same issues happened to be

before a federal court."  *Ecee, Inc. v. FERC*, 645 F.2d 339, 349 -350 (5th Cir. May 1981).

Rather, determining whether a plaintiff has Article III standing is not only the function but the

affirmative duty of the federal court in which an action is pending, even if the issue is not raised

by the parties.  *See United States v. Hays*, 515 U.S. 737, 742 (1995).  District courts are

intimately familiar with such a task, and they are generally well equipped to perform any

necessary factfinding ancillary to it.[24]  *See Washington v. Norton Mfg., Inc.*, 588 F.2d 441, 443

(5th Cir. 1979) (noting that the district court has "broad discretion" in resolving jurisdictional

issues and "the judge may determine these issues by receiving affidavits, interrogatories,

depositions, oral testimony, or any combination of the recognized methods of discovery.").

Moreover, any new evidence or findings related to American's injury as they relate to the

aggregate cap determination under the statute may be confined in its application to the court's

resolution of the jurisdictional issue and would not impinge on the agency's policy-making

---

[24]The court recognizes that the focus of judicial review of an agency's action under the APA is typically limited to an examination of the existing administrative record, not some new record created in the reviewing court.  *See Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971)).  However, de novo review of an issue may be appropriate even under the ADA where there are inadequate factfinding procedures in an agency adjudicatory proceeding.  *Camp*, 411 U.S. at 142.  Given that there was no factfinding at all at the agency level regarding the existence or extent of American's injury from the regulation or what its aggregate cap would have been under the statute, it is at least arguable that a trial de novo of such issues would be appropriate here.  But even if not, adherence to the principle that judicial review is limited to the administrative record does not imply that a district court loses its ability to take evidence or make determinations in limited circumstances as relating to jurisdictional facts.  *See Metz v. United States*, 466 F.3d 991, 998 (Fed. Cir. 2006).

prerogatives.  Specifically, the nature and extent of American's injury logically can have no

bearing on whether or not the regulation itself is invalid as conflicting with the statute.  Nor

would such matters influence the relief that might be awarded, for, even if American were

ultimately to succeed on its claim, the appropriate course would be simply to set aside the

regulation and the agency's action based thereupon and *then* remand to the agency to allow

reconsideration under a lawful standard.  *See Haven, supra*; *Pollgreen,* 770 F.2d at 1544.  Given

both that the PRRB is not itself concerned with Article III standing requirements and that it is

*legally impossible* for HHS to change its decision based upon American's claim, a remand of the

type ordered in *Heart to Heart* and *Sojourn Care* effectively treats the PRRB as if it has some

generalized duty to assist a district court as an adjunct hearing examiner and factfinder on

standing issues.  While such a referral might be appropriate if made to a United States Magistrate

Judge, *see generally* 28 U.S.C. § 636(b), the undersigned does not believe that the PRRB is due

to be saddled with such burdens.  Accordingly, HHS's motion for summary disposition is due to

be denied to the extent that it seeks a remand to the PRRB.  *See Hospital Ass'n of Rhode Island*,

820 F.2d at 538-39 (declining to remand action to HHS prior to determining the validity of a

particular Medicare reimbursement rule where it was undisputed that the rule would be applied to

the plaintiffs' claims but the PRRB lacked authority to consider questions of law pertaining to

the rule's validity).

        **C.**      **The Merits of American's Challenge to 42 C.F.R. § 418.309(b)(1)**

      Finally, HHS argues that it is entitled to summary judgment on the merits of American's

claim.  The parties do not dispute the nature of that claim or the basic legal standards applicable

to evaluate it.  Specifically, the question presented by American's claim is whether 42 C.F.R. §

418.309(b)(1) is invalid as conflicting with the controlling statute, 42 U.S.C. § 1395f(i)(2)(C),

under the standards articulated by the Supreme Court in *Chevron* and its progeny.   HHS urges

that it is due to prevail on its motion because the regulation is a valid and permissible

implementation of the Medicare statute.   The court disagrees.

A regulation promulgated pursuant to an express delegation of legislative authority, as

here, is to be given controlling weight unless found to be arbitrary, capricious, or contrary to

statute.  *Gregory v. First Title of Amer., Inc.*, 555 F.3d 1300, 1302 (2009).  In *Chevron*, the

Supreme Court explained a district court's role in reviewing an agency's construction of a

statute:

> [The Court] is confronted with two questions.  First, always, is the question
> whether Congress has directly spoken to the precise question at issue.  If the intent
> of Congress is clear, that is the end of the matter; for the court, as well as the
> agency, must give effect to the unambiguously expressed intent of Congress.  If,
> however, the court determines Congress has not directly addressed the precise
> question at issue, the court does not simply impose its own construction of the
> statute, as would be necessary in the absence of administrative interpretation.
> Rather, if the statute is silent or ambiguous with respect to the specific issue, the
> question for the court is whether the agency's answer is based on a permissible
> construction of the statute.

*Chevron*, 467 U.S. at 842-43.

Accordingly, when a statute directly addresses an issue, courts give the language of the

statute effect and accord no deference to the agency's interpretation.  *Sierra Club, Inc. v. Leavitt*,

488 F.3d 904, 912 n. 12 (11th Cir. 2007).  To determine whether Congress has "directly spoken

to the precise question at issue," a court employs "traditional tools of statutory construction."

*Chevron*, 467 U.S. at 843 n. 9.  "'In ascertaining the plain meaning of the statute, the court must

look to the particular statutory language at issue, as well as the language and design of the statute

as a whole.'" *Sullivan v. Everhart*, 494 U.S. 83, 89 (1990) (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)).  "In the absence of an indication to the contrary, words in a statute are assumed to bear their ordinary, contemporary, common meaning." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 n. 5 (2002) (citation and internal quotation marks omitted).

Only if the court determines that the statute does not directly address the matter at issue should it proceed to step two of the *Chevron* analysis, to consider the reasonableness of the agency's interpretation of a statute.  *See National Credit Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 938-39 (1998).  The Supreme Court has further explained:

> The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.  If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation.  Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.  Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit.  In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

*Chevron*, 467 U.S. at 843-44 (citation, quotation marks, and footnote omitted).

The court agrees with American that 42 C.F.R. § 418.309(b)(1) fails at the first step of the *Chevron* analysis, because it is contrary to the intent of Congress expressed in the plain and unambiguous language of the controlling statute, 42 U.S.C. § 1395f(i)(2)(C).  In so holding, the court also aligns itself with both *Haven* and *Sojourn Care*, which appear to be the only other cases to have addressed the issue.  The statute and the regulation both require a provider's aggregate cap amount to be calculated by multiplying an established per-patient cap amount by

58

the number of beneficiaries deemed to have been served by the provider during the relevant fiscal year.  The statute and regulation unmistakably diverge, however, in how they address the issue of allocating cap amounts for patients who may have received care in more than one fiscal year.  The statute confronts the issue by directing that the provider's number of beneficiaries for the fiscal year is to be "reduced to reflect the proportion of hospice care that each such individual was provided in a previous or subsequent accounting year."  42 U.S.C. § 1395f(i)(2)(C).  On its face, that language mandates a division and assignment of the cap allocation for "each ... individual" beneficiary between *each* fiscal year in which care was provided, in "*proportion*" to the amount of care actually provided in each fiscal year.  The regulation's method of allocation, however, is entirely contrary, for it does not attempt to do any of that.  Rather, the regulation assigns the *entirety* each beneficiary's allocation to a *single* fiscal year based *solely* upon the date of admission to the program.

HHS asserts that "operative words in the statutory provision – the verb 'reflect' and its object, 'the proportion,' – are by their nature terms of ambiguity, and thus they allowed the Secretary some discretion" in determining how to avoid "double-counting" beneficiaries that receive care in multiple fiscal years.  (Dft. Mem. at 30).  The court disagrees.  In some contexts, the term "proportion" could conceivably be ambiguous, in that it might not imply an exactly "equal" proportion or relationship between two things.  *See, e.g., First Nat. Bank of Milaca v. Heimann*, 572 F.2d 1244, 1249 (8th Cir. 1978) (upholding regulation that established charge to be paid by banks for periodic examinations based upon a sliding scale fixed fee plus a percentage of assets, as not conflicting with statute requiring charges to be made "in proportion to assets or resources held by the banks"; noting that the "term 'in proportion' is not precise" because "the

statute does not say exactly what the proportional relationship is.").  Here, however, the meaning of the word here is clear.  It is essentially synonymous with the terms "percentage" or "ratio."  *See*  http://www.merriam-webster.com/dictionary/proportion.  A cap calculation necessarily must be performed for every eligible provider every fiscal year, and the statute manifestly seeks to match up cap allocations to care provided for each individual beneficiary.  As such, there is simply no rational basis for concluding that the "proportion" referenced in the statute implies something other than that the percentage of each beneficiary's cap allocation to a given fiscal year is to correspond directly with the percentage of the days of care provided to the beneficiary in that year, in relation to the number of days of care provided in the prior or subsequent year.  Even assuming for the sake of argument that some other "proportion" could conceivably exist in this context, the fact remains that the regulation's method of cap allocation simply has *no relationship whatever* to the "proportion" of care that each individual beneficiary receives in a given year relative to another.  Instead, the regulation always assigns *all* of a patient's cap allocation only to a *single* year based only upon when the beneficiary entered the program, regardless of the distribution of care across fiscal years.

It might also be assumed, as HHS contends, that the word "reflect" can imply "a certain amount of imprecision" or estimation in attempting to measure or quantify something.  (*See id.* at 30-31, citing *Board of Trade of City of Chicago v. SEC*, 187 F.3d 713 (7th Cir. 1999)).  Even so, unlike the *Board of Trade* case, HHS's regulation does not attempt to create a proxy or otherwise produce a number that "reflect[s]" the amount of the particular "something" that the statute specifies to be measured, *i.e.*, "the proportion hospice care that each ... individual was provided in a previous or subsequent accounting year."  Instead, the regulation's method attempts to

"reflect" something else entirely.  In essence, what the regulation attempts to "reflect" or otherwise estimate is the provider's *ultimate, aggregate cap number* as calculated using the statute's method of allocation, based upon assumptions that inevitable disproportionately low cap allocations (relative to the statutory method) for some beneficiaries for the given fiscal year will, on average, be balanced, in the aggregate, by disproportionately high allocations for other beneficiaries.  That is simply not what the text of the statute requires.  *See Haven* slip op. at 7 ("Congress unquestionably required that the number of medicare beneficiaries be reduced to reflect 'the proportion' (not simply *a* proportion or *an* estimate, as Defendant would have 'reflect' mean in this context) of hospice care that 'each such individual' (not individuals in the aggregate) 'was provided in a previous or subsequent accounting year." (emphasis original) (footnote omitted)).  Because HHS cannot show that it is entitled to prevail on the merits of American's challenge to the regulation, HHS's motion for summary judgment is due to be denied.[25]

## IV.    CONCLUSION

Based on the foregoing, the undersigned concludes that both of the cross-motions for summary judgment are due to be denied.  American's motion (Doc. 16) is due to be denied because, while American's complaint alleges facts that would, if supported by substantial evidence, establish Article III standing, American has not presented such evidence to this point in

---

[25]The court recognizes that should this or another court ultimately and finally invalidate the regulation, this will almost certainly cause significant administrative difficulties.  The statutory method of assigning cap allocations is indeed quite burdensome because one cannot determine cap allocations for all individual patients at the conclusion of each fiscal year. Specifically, it cannot be known at that time how long into the next fiscal year each patient will continue to receive care, so the "proportion" of care received in each fiscal year cannot be calculated.   Ultimately, a provider's aggregate cap for a given fiscal year will not be subject to an accurate, final accounting until the last of its patients receiving care in that fiscal year cease receiving care in the program.  Nonetheless, the fact that an agency's interpretation or action eases the agency's administrative burden cannot save a regulation that is inconsistent with the administrative structure that Congress enacted into law.  *See Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 91 (2002).

the litigation.  The dispositive motion of HHS (Doc. 17) is likewise due to be denied because: (1) American's pleading does confer threshold standing, (2) a remand to the PRRB is neither required nor warranted at this time, and (3) the regulation American challenges conflicts with the text of the statute it purports to implement.  An appropriate order will be entered.

**DONE** this 26th day of January, 2010.

**JOHN E. OTT**
United States Magistrate Judge

62